Margaret Ann **BEHRINGER**, Appellant,

v.

Lewis W. **BEHRINGER**, Appellee.

No. 2–93–228–CV.

Court of Appeals of Texas, Fort Worth.

Aug. 24, 1994.

Rehearing Overruled Oct. 25, 1994.

Hooper & Evans, and Jeffrey H. Kobs, Fort Worth, Kennedy, Minshew, Campbell, & Morris, and Jack Kennedy, Sherman, for appellant.

Philips and Hopkins, P.C., and Robert N. Eames, Randolph W. Stout, Denton, for appellee.

Before FARRIS, LATTIMORE and DAY, JJ.

## OPINION

DAY, Justice.

During a divorce proceeding, Lewis W. Behringer sued Margaret Ann Behringer for intentional infliction of emotional distress. After a bench trial, the trial court awarded Lewis $13,000 in damages. We affirm.

■ The tort of intentional infliction of emotional distress is composed of the following elements: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman*

*v. Twyman*, 855 S.W.2d 619, 621–22 (Tex. 1993). In her sole point of error, Margaret complains the trial court improperly rendered judgment for Lewis because there is no evidence of the first, second, and fourth of these elements in this case.

■ In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding of trier of fact and disregard all evidence and inferences to the contrary. *See Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex. 1988); *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *In re King's Estate*, 244 S.W.2d at 661–62.

■ A "no evidence" point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960).

### INTENTIONAL OR RECKLESS

Margaret asserts the record contains no evidence that she acted with the intent to inflict emotional distress or engaged in conduct recklessly and without regard to the consequences of her actions. She further asserts, without record support, that she explained her actions at trial as being done in an effort to force Lewis to discontinue an affair she believed he was engaged in and to help restore their marriage.

First, we note that Margaret's alleged *motives* for her actions, *i.e.*, her desires to end Lewis's alleged affair and to help her marriage, are not at issue in this case. Motive

and intent are two different things. "Intent, in its legal sense, is quite distinct from motive. It is defined as the purpose to use a particular means to effect a certain result. Motive is the reason which leads the mind to desire that result." *James Stewart & Co. v. Law*, 149 Tex. 392, 233 S.W.2d 558, 561–62 (1950).

▇▇▇▇ Intentional conduct requires a showing that the actor desired the consequences of her act. *LaCoure v. LaCoure*, 820 S.W.2d 228, 233 (Tex.App.—El Paso 1991, writ denied). Intent may be inferred from the circumstances of the case and the conduct of the actor, not just from overt expressions of intent by the actor. *Id.* An actor is reckless when she knows or has reason to know of facts that create a high degree of risk of harm to another, and deliberately proceeds to act in conscious disregard of, or indifference to, that risk. *Twyman*, 855 S.W.2d at 624. Of course, rarely will a defendant admit knowing to a substantial certainty that emotional harm would befall the victim. The trier of fact is free, however, to discredit the defendant's protestations that no harm was intended and to draw inferences necessary to establish intent. *Id.* at 623.

### MARGARET'S CONDUCT

The evidence that tends to support the trial court's findings as to Margaret's intentional and reckless conduct is as follows:

### A. DEATH THREATS

▇▇▇▇ Margaret talked to Lewis about a hit man and told him she could make one telephone call and he would be gone; that he needed to keep his head over his shoulder; that someone might beat him like he'd never been beaten before. Margaret would also wake Lewis up at night and tell him God was going to give him cancer and a heart attack.

One night, Lewis went to bed around 10:30 p.m., as was his habit. At approximately 1:30 a.m., Margaret burst into the bedroom where Lewis was sleeping and accused him of stealing a book from her purse. After searching part of the house for the book, Margaret returned to Lewis's bedroom, pulled a pistol out from behind a dresser, pointed it at Lewis and stated: "I found a gun. . . . I think I'll just shoot you." Margaret then pulled the trigger several times. Although the pistol turned out to be a toy, it looked like a .38 caliber pistol of Lewis's that Margaret had recently taken. A few minutes later Margaret said, "[S]ince everybody thinks I'm crazy, I can kill you and they won't do nothing to me."

### B. PRIVATE INVESTIGATORS

Margaret admitted to hiring two or three private investigators on her own accord and another through a former attorney. While the hiring of a private investigator may not be uncommon during a period of marital discord, Lewis's experience of being trailed by strangers must be viewed in context with Margaret's repeated death threats. Moreover, the record shows that none of the investigators provided Margaret with the information she sought, that is, evidence that Lewis was having an extramarital affair. When the investigators discovered nothing of significance, Margaret fired them.

On one occasion, Margaret shook Lewis awake in the early hours of the morning, all the while shouting, swearing, and insisting that he get a motel room. Margaret offered Lewis a $100 bill to pay for the room. Afraid that Margaret would wake the neighbors, Lewis left the house and drove around for a while in his pickup. Finally, he called a longtime friend, Jimmy Owens, and asked if he could talk to Owens or stay at Owens' home.

Lewis and Owens talked for several hours, and then Owens went outside to get his newspaper. He noticed a car parked near his house and talked to the occupants of the vehicle, a man and a woman. Owens also wrote down the car's license number. Lewis and Owens later learned that the car was registered to Ken Truder, one of the private investigators that Margaret had hired. Margaret had instructed Truder to watch the Behringer residence after 10:30 p.m. so he could catch Lewis sneaking out of the house after Margaret went to sleep.

## C. ALLEGED ADULTERY

Beginning at the end of 1990 and continuing until trial in February 1993, Margaret continuously accused Lewis of having a girlfriend, although she would not give any basis for her belief. Lewis denied Margaret's accusations but was unable to convince her to the contrary. The record shows that Margaret based her belief on the following: (1) Lewis would sleep all day; (2) he wanted new underwear; (3) he started cutting his toenails; (4) he asked Margaret about vitamins and if she had had her orange juice; (5) someone would call the house and hang up (Lewis offered to have the telephone number changed and agreed to allow the police to trace the Behringers' incoming calls); (6) Lewis bought some stock; and (7) he was taking money out of his bank account and out of his safe.

Kenneth Harper, a childhood friend of Lewis's, testified: One Sunday morning Margaret had Harper paged from his Sunday School class so she could speak to him. Outside of class, Margaret informed Harper that she had just received word by telephone that Lewis had been in a car wreck. Margaret asked Harper to take her to the scene of the accident, and Harper agreed to do so.

As they were driving to the alleged accident scene, Harper questioned Margaret about the accident. Margaret did not seem very upset about the wreck and did not discuss it much. Instead, she began to talk about her marital problems. Margaret told Harper she had found out that Lewis was seeing a woman named N.R. and that Lewis had arranged for a law enforcement officer to break into the Behringers' home.

Upon arriving at the place where the crash allegedly occurred, Harper saw no sign of an accident and asked Margaret where Lewis was supposed to be. Margaret continued to direct Harper well past that point and then asked Harper to stop for a minute. Harper said:

> What are you doing[?] ... Here I am on a Sunday morning and my wife doesn't even know where I am. I left Sunday school class, and she don't even know where I am and we're out here on a wild goose chase.

I said, "What is going on," and so [Margaret] says, "I'm just going to see if his car is parked over there."

Q Going to see what?

A "I was going to see if his car was parked over there."

Q Over where?

A Over to this house that she was pointing to. And so I says, "Are you checking on Lewis?"

. . . .

A I said, "Are you checking on Lewis? Is that what this is all about?" She said, "Well, I thought his car might be parked there." She said, "I think that's where [N.] lives" or, "That's where she lives."

. . . .

Q Did you check later to see if that was where [N.R.] lives?

A No, sir. I never have been back out there again in my life.

Q All right.

A And so I told her, I said, "I'm taking you back, Margaret." I said, "Lewis hasn't even been in an accident, has he? He hasn't even been in an accident." "Well, no."

. . . .

Q Did you see Lewis' pickup parked out there at any of those places you were taking her?

A No, sir, I didn't see Lewis' pickup anywhere.

Lewis testified that he did not know who Margaret thought his mistress was and that Margaret refused to give him anyone's name. Lewis even offered to accompany Margaret to talk with his alleged lover, to no avail. Margaret's only response was, "I don't have to tell you nothing." Lewis finally learned N.R.'s name from Harper. Lewis testified he did not know N.R. and he had never seen her before in his life.

N.R. testified at trial that she had resided in Denton, Texas (where the Behringers also lived) for thirty to forty years and knew lots of people. She did not recognize Lewis in the courtroom and testified that she had never seen him prior to that day. She fur-

ther testified that she did not know anyone named Lewis Behringer.

## D. ALLEGED POISONING

Betty Neu, who had known Lewis for thirty-three years, testified: Lewis worked part-time making deliveries for Betty's husband, a pharmacist. Margaret telephoned Betty and stated she was aware Mr. Neu and Lewis had been friends for a long time and that Mr. Neu would do anything for Lewis. Margaret informed Betty that she (Margaret) feared Mr. Neu would give Lewis strychnine so Lewis could poison Margaret. Nothing in the record supports this allegation.

This evidence supports the trial court's finding that Margaret acted intentionally and recklessly to inflict emotional distress on Lewis.

## EXTREME AND OUTRAGEOUS CONDUCT

This evidence also supports the trial court's finding that Margaret's conduct was extreme and outrageous.

■ Liability for extreme and outrageous conduct arises only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Diamond Shamrock Rfg. v. Mendez,* 844 S.W.2d 198, 202 (Tex.1992); RE-STATEMENT (SECOND) OF TORTS § 46 cmt. d (1965). Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!" RESTATEMENT (SECOND) § 46 cmt. d.

■ Whether the defendant's conduct is so extreme and outrageous as to permit recovery is a question of law. *Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993); RE-STATEMENT (SECOND) § 46 cmt. h. Only if reasonable minds may differ does the fact finder determine whether, in a particular case, the conduct was sufficiently extreme and outrageous to result in liability. RE-STATEMENT (SECOND) § 46 cmt. h. Although we question whether reasonable minds would differ in their assessment of Margaret's conduct, at the very least, it was sufficiently extreme and outrageous to support the trial court's finding on this issue.

## SEVERE EMOTIONAL DISTRESS

■ Emotional distress includes all highly unpleasant mental reactions, such as fright, humiliation, embarrassment, anger, worry, and nausea. *Qualicare v. Runnels,* 863 S.W.2d 220, 222 (Tex.App.—Eastland 1993, writ filed); RESTATEMENT (SECOND) § 46 cmt. j (1965). The law intervenes only where the distress is so severe that no reasonable person should be expected to endure it. RESTATEMENT (SECOND) § 46 cmt. j. The intensity and duration of the distress are factors to be considered in determining its severity. Although severe distress must be proved, in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress existed. *Id.* Whether severe emotional distress can be found is a question of law; whether it existed in a particular case is a question of fact. *Qualicare,* 863 S.W.2d at 222; *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 945 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.); RESTATEMENT (SECOND) § 46 cmt. j.

■ In this case, Lewis testified: After Margaret made the threats of death and serious bodily injury, he cried in front of other people many times when talking about the situation. Margaret's conduct made his day-to-day life terrible. As a result of Margaret's threats and actions, Lewis was in fear of his life every day, all the time. In fact, he became so afraid that he often slept on the couch in order to have access to both the front and back doors. When he did go into his bedroom to sleep, he put a chair in front of the door to prevent someone from bursting into the room. He also slept with a pistol beside his bed every night. He did not leave his house at night from August 1991 until the time of trial in February 1993 because he was so afraid.

Edgar Barrow, who had known Lewis for thirty years, testified that Lewis confided his fear that "he may be shot, killed or some-

thing like that. He is scared to death." Barrow further testified that Lewis appeared nervous and very upset.

Kenneth Harper testified:

Well, [Lewis is] just—I worry about him some. He's just—he's felt like—it seems to me like he's felt like the whole world has just kind of come crashing in on him for no reason at all.

. . . .

Lewis—I've been over to see him and he'd cry, cried a whole lot. He just cried all the time. He just cried a whole lot, got real nervous and cried, and he couldn't hardly talk.

Harper further testified that Lewis was much thinner than he had been and would not go out to get a cup of coffee or anything like that anymore, even though Harper had invited him many times. On cross-examination, Harper testified that he had friends and loved ones who had gone through "bad divorces," but not like Lewis's:

Q Have you noticed all of them practically having—being distressed and anxious, losing their appetite, going through all kinds of—

A Well, I'm sure they did to a degree, sir, but I've never seen anybody that it seemed to affect as much as it did Mr. Behringer.

This evidence supports the trial court's finding that Lewis suffered severe emotional distress. *See Qualicare,* 863 S.W.2d at 223 (victims were terribly upset by threats, hang-up telephone calls, surveillance, and floral arrangement with black rose and black balloons; one victim testified that the harassment made her paranoid about her family's safety and gave her debilitating migraine headaches; other victim testified that her blood pressure had dramatically increased); *Tidelands,* 699 S.W.2d at 945 (victim closed himself up in his room for several days and could not talk with his children; stated he was upset and did not want to see anyone; victim's daughter testified that victim was upset, very angry, and became ill and disoriented).

Because the evidence supports the trial court's findings that Margaret intentionally and recklessly engaged in extreme and out-rageous conduct that caused Lewis severe emotional distress, we overrule Margaret's point of error.

The trial court's judgment is affirmed.