**Joe MUNOZ and Denise Munoz, Plaintiffs,**

v.

**H & M WHOLESALE, INC., Defendant.**

**Civil Action No. H–94–CV–4205.**

United States District Court,
S.D. Texas,
Houston Division.

May 10, 1996.

600

Donald R. Taylor and Robert L. Brown, III, Taylor & Dunham, L.L.P., Austin, Texas, for Plaintiffs.

Shadow Sloan and Thomas H. Wilson, Vinson & Elkins, Houston, Texas, for Defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant H· & M Wholesale, Inc.'s ("H & M") Motion for Summary Judgment (# 19). H & M seeks summary judgment on Plaintiff Joe Munoz's ("Munoz") claims of violations of the Americans with Disabilities Act ("ADA") and Texas Labor Code § 451.001. H & M also seeks summary judgment on Munoz and his wife, Denise Munoz's ("Denise"), claim of intentional infliction of emotional distress.

Having reviewed the motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the defendant's motion for summary judgment should be granted in part and denied in part.

### I. *Background*

H & M, located in Bryan, Texas, is a seller and distributor of petroleum products. Mary Walker ("Walker"), who is the president of H & M, took over the company's operations in 1991 after her husband's death. James Boedeker ("Boedeker"), Walker's son, is vice

president of H & M. Boedeker is also president of Max Food Mart, Incorporated ("Max Food Mart"), a chain of convenience stores located in Bryan. H & M is responsible for the structural and gasoline pump maintenance at the Max Food Mart stores. Walker originally hired Munoz to do yard work at her home. In July 1989, H & M hired Munoz as one of its two oil delivery drivers. H & M never employed more than two full-time drivers at any time. Munoz's job duties included loading fifty-five gallon drums of oil and cases of petroleum products onto a truck. When delivering products to the customers' facilities, Munoz had no assistance unloading the products about half of the time. Overtime work was required on occasion.

On February 9, 1994, Munoz injured his back while he and two other H & M employees were was jackhammering concrete out of a driveway and throwing the broken concrete onto a truck. On February 10, Boedeker sent Munoz to a chiropractor, Dr. J.R. Parker ("Parker"), when Munoz complained of back pain. Parker suggested that Munoz take off from work for the rest of the day. Munoz reported to work on February 11 and told Linda Bird ("Bird"), H & M's secretary, that he did not feel well and was taking the rest of the day off. Munoz had not yet seen a physician for his sore back. On February 12, Munoz went to the emergency room at a local hospital where X-rays were taken of his back. The emergency room doctor prescribed physical therapy and gave him an excuse from work.

Munoz saw an orthopedist, Dr. David Bailey ("Bailey"), on February 16, 1994. In papers Munoz filled out at Bailey's office, Munoz described his duties at work—such as heavy lifting—and provided a worker's compensation history. When asked on the form, "Do you work with others who can assist you to perform heavy work?"; Munoz checked "No." In response to the question, "Are there light duty tasks available for you to request during your recovery?"; Munoz also answered "No." Bailey recommended that Munoz be off work for one week, until February 23, 1994. Bailey extended Munoz's time off on two more occasions.

Bird filled out the Employer's First Report of Injury on February 18, 1994. H & M did not contest Munoz's claim for workers' compensation benefits. On March 2, 1994, H & M made the decision to terminate Munoz' employment. Boedeker drove to Munoz's home to give him the news. According to Munoz, Boedeker asked him how he was doing financially and whether he needed anything. Munoz told him he was doing okay. Boedeker then informed Munoz that H & M would have to let him go and that they did not want him back as an oil delivery driver because they were afraid Munoz would re-injure himself. Boedeker, however, according to Munoz, told Munoz that he would give him other types of work.

On March 10, after H & M had terminated Munoz, Munoz's doctor released him to return to work on light duty, which prohibited Munoz from lifting more than twenty-two pounds. H & M hired a person from outside the company to fill Munoz's position. According to Munoz, in the Spring or Summer after Munoz was fired, an employee named Ed Sikorski ("Sikorski") retired. H & M transferred Noe Rodriguez ("Rodriguez") to fill the position, leaving Rodriguez's unfilled. An oil delivery position became open in late June 1994. Munoz received a full release to return to work on June 27, 1994. Munoz, however, never attempted to contact Boedeker or Walker regarding the availability of other work after he was terminated.

On September 5, 1994, Munoz filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the ADA. On December 13, 1994, the Munozes brought suit against H & M. Munoz alleges violations of the ADA and workers' compensation retaliation in violation of Texas Labor Code § 451.001. Both Munoz and Denise claim violations under the Employee Retirement Income Security Act of 1974 ("ERISA"), due to H & M's failure to provide them with notice of their right to continue health insurance coverage as mandated by the Comprehensive Budget Reconciliation Act ("COBRA"). Munoz and Denise also claim intentional infliction of emotional distress. On December 4, 1995,

H & M filed its motion for summary judgment on all of the Munozes' claims.

On January 11, 1996, in its reply to the plaintiffs' response to the motion for summary judgment, H & M advised the court that it was withdrawing its request for summary judgment on the Munozes' claim under ERISA, conceding that H & M failed to provide Munoz with formal notice of his right to continue his health benefits as required by COBRA. H & M states that Munoz is not entitled to a jury trial on his ERISA claim, but rather it is for the court to determine the amount of the penalty, if any, to be assessed against H & M. The parties are in dispute as to whether Denise was a covered beneficiary under Munoz's medical insurance policy; H & M contends that Denise's ERISA claim should be dismissed. The status of Denise's coverage, however, need not be addressed at this time.

## II. *Analysis*

### A. *The Applicable Standard*

 Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 257, 106

S.Ct. at 2514–15; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### B. *Americans with Disabilities Act*

#### 1. *Prima Facie Case of Handicap Discrimination*

 The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To recover under this statute, Munoz must prove that he was discriminated against on the basis of his disability. *R.G.H. v. Abbott Labs.*, No. 93 C 4361, 1995 WL 68830, at *9 (N.D.Ill. Feb. 16, 1995). He may present either direct or circumstantial evidence of disability discrimination or may employ the indirect method of proof utilized by the courts in other types of discrimination cases. *Id.*

 Although the case law is scant regarding the ADA, especially within the Fifth Circuit, the few courts that have addressed claims brought under the Act have looked to Title VII and the Rehabilitation Act to provide guidance as to the elements that constitute a *prima facie* case of disability discrimination. *Aucutt v. Six Flags Over Mid–America, Inc.*, 869 F.Supp. 736, 743 (E.D.Mo. 1994); *see R.G.H.*, 1995 WL 68830 at *9; *Grinstead v. Pool Co.*, No. 93–2320, 1994 WL 25515, at *2 (E.D.La. Jan. 20, 1994), *aff'd*, 26 F.3d 1118 (5th Cir.1994). The language adopted in the ADA tracks that of the Rehabilitation Act of 1973, which provides in part that " '[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, ... be subjected to discrimination under any program or activity receiving federal financial assistance.' " *White v.*

*York Int'l Corp.,* 45 F.3d 357, 360 n. 5 (10th Cir.1995) (quoting 29 U.S.C. 794(a)). "Because the ADA expressly requires its provisions to be interpreted in a way that 'prevents imposition of inconsistent or conflicting standards for the same requirements' under the two statutes," case law interpreting the Rehabilitation Act's " 'otherwise qualified' requirement" may be relied upon "in determining whether [Munoz] was 'qualified' under the ADA." *Id.* (quoting 29 U.S.C. § 12117(b)); *see also Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942–43 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995) (citing 29 C.F.R. § 1630, App. 1630.2(g)); *Chandler v. City of Dallas,* 2 F.3d 1385, 1391 n. 18 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). "Thus, whether suit is filed against a federally-funded entity under the Rehabilitation Act or against a private employer under the ADA, the substantive standards for determining liability are the same." *Myers v. Hose,* 50 F.3d 278, 281 (4th Cir.1995).

 To state a *prima facie* case under the ADA, the plaintiff must show that: (1) he or she suffers from a "disability;" (2) he or she is a "qualified individual;" (3) he was subject to an adverse employment action; and (4) he was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *R.G.H.,* 1995 WL 68830, at *9; *Aucutt,* 869 F.Supp. at 743; *see also White,* 45 F.3d at 360; *Villarreal v. J.E. Merit Constrs., Inc.,* 895 F.Supp. 149, 151–52 (S.D.Tex.1995); *Rogers v. Int'l Marine Terminals, Inc.,* No. 94–0056, 1995 WL 16787, at *3 (E.D.La. Jan. 17, 1995); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La.1994) (citing *Chandler,* 2 F.3d at 1390 [Rehabilitation Act] ); *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1345 (S.D.Tex.1987), *aff'd,* 863 F.2d 881 (5th Cir.1988) [Texas Commission on Human Rights Act]. If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory justification for its actions. *R.G.H.,* 1995 WL 68830, at *9 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101

S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)); *Grinstead,* 1994 WL 25515, at *2. If the employer meets its burden of production, the presumption is dissolved, and the burden shifts back to the plaintiff to prove that the proffered reasons are a pretext for discrimination. *R.G.H.,* 1995 WL 68830, at *9; *Grinstead,* 1994 WL 25515, at *2. As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *White,* 45 F.3d at 361 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–12, 113 S.Ct. 2742, 2747–49, 125 L.Ed.2d 407 (1993)).

### 2. *ADA Qualified Disability*

 The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such impairment.

42 U.S.C. § 12102(2); *see also Washington v. HCA Health Servs. of Tex. Inc.,* 906 F.Supp. 386, 390 (S.D.Tex.1995); *Villarreal,* 895 F.Supp. at 152. The ADA further restricts the meaning of physical and mental impairment as:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

*Dutcher v. Ingalls Shipbuilding,* 53 F.3d at 723, 726 n. 5 (5th Cir.1995) (quoting 29 C.F.R. § 1630.2(h)(1), (2)). "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life

activities." *Id.* at 726. The ADA defines neither "substantially limits" nor "major life activities," but the EEOC regulations under the ADA, which adopt the same definition of major life activities as used in the Rehabilitation Act, provide significant guidance. *Id.*; *see also Bolton,* 36 F.3d at 942; *Chandler,* 2 F.3d at 1391. "Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Dutcher,* 53 F.3d at 726 (quoting 29 C.F.R. § 1630.2(i)); *Bolton,* 36 F.3d at 942; *Chandler,* 2 F.3d at 1390. The factors that should be considered in determining whether an impairment substantially limits a major activity include:

(1) the nature and severity of the impairment,

(2) its duration or expected duration, and

(3) its permanent or expected permanent or long-term impact.

*Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (citing 29 C.F.R. § 1630, App., § 1630.2(j)); *Dutcher,* 53 F.3d at 726; *Bolton,* 36 F.3d at 943; *Washington,* 906 F.Supp. at 390. Substantially limited means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

*Dutcher,* 53 F.3d at 726 n. 8 (quoting 29 C.F.R. § 1630.2(j)(i), (ii)).

 While "working" is listed as one of the major life activities, " 'working' does not mean working at a particular job of one's choice." *Turco v. Hoechst Celanese Chem. Group, Inc.,* 906 F.Supp. 1120, 1127 (S.D.Tex. 1995) (citing *Wooten v. Farmland Foods,* 58 F.3d 382, 385–86 (8th Cir.1995)); *see also Dutcher,* 53 F.3d at 727. " '[S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having com-

parable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.' " *Dutcher,* 53 F.3d at 727 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). An employee's inability to perform one aspect of his job while retaining the ability to perform the work in general does not "constitute a substantial limitation of the activity of working." *Id.* (citing *Chandler,* 2 F.3d at 1392) (citing with approval *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. at 1343)); *Washington,* 906 F.Supp. at 390.

 In the case at bar, Munoz's injury limited his ability to perform his job as an oil delivery driver for H & M. Munoz, however, presents no evidence that his alleged disability prevented him from performing an entire class of jobs. Hence, Munoz's injury does not appear to be a recognized disability for purposes of the ADA. There, likewise, is no evidence that Munoz has a record of disability, or that he has a " 'history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more life activities.' " *Dutcher,* 53 F.3d at 727 (quoting 29 C.F.R. § 1630.2(k)).

H & M, however, appears to regard Munoz as having a disability. In its motion for summary judgment, H & M does not dispute the validity of Munoz's disability as ADA qualified. At deposition, Munoz testified that Boedeker told him that he was discharged because Boedeker was concerned that he would reinjure himself if he continued to work as a driver. H & M, therefore, regarded Munoz as having a disability relating to his back injury that affected his ability to work, a position that H & M continues to maintain. The *Dutcher* Court noted that "Dutcher might have qualified as disabled under the ADA if she could have provided sufficient summary judgment evidence that she was regarded by Ingalls as having an impairment that substantially limited a major life activity, whether she actually had such an impairment or not." *Id.* (citing 42 U.S.C. § 12102(2)(C)). Here, Munoz has provided sufficient summary judgment evidence that he was regarded by H & M as having an impairment that substantially limited a major

life activity, whether he actually had such an impairment or not. Thus, Munoz has satisfied the first element of a *prima facie* case of handicap discrimination.

### 3. *Otherwise Qualified*

The ADA protects a " 'qualified individual with a disability' ... who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Fifth Circuit, in *Chandler v. City of Dallas*, sets forth a two-part analysis for determining whether a person is qualified under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, *i.e.*, functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

2 F.3d at 1393–94 (citing *Chiari v. City of League City*, 920 F.2d 311, 317 (5th Cir. 1991)); *Milton v. Scrivner*, 53 F.3d 1118, 1123 (10th Cir.1995); *White*, 45 F.3d at 361–62.

▆▆▆ The regulations implementing the ADA define essential functions as " 'those functions that the individual who holds the position must be able to perform unaided or with the assistance of a reasonable accommodation.' " *Milton*, 53 F.3d at 1124 (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(n)). Essential functions must "bear more than a marginal relationship to the job at issue." *Chandler*, 2 F.3d at 1393. It is undisputed that prior to his termination, Munoz had not been released by his physician to return to work—either for light or heavy duty tasks. An essential requirement of the oil delivery driver position at H & M included the lifting of fifty-five gallon oil drums and unloading the drums from the truck at the customers' stores, often without assistance. Thus, at the time of his termination, Munoz could not perform an essential function of his job, required of all oil delivery drivers at H & M, without accommodation.

▆▆▆ Although a disabled employee may be unable to perform the essential functions of a position, his termination may be unlawful if the employer has failed reasonably to accommodate the employee's disability. *Myers*, 50 F.3d at 282 (citing *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1130–31 n. 17, 94 L.Ed.2d 307 (1987)). The ADA defines reasonable accommodation as " 'modification or adjustments to work environment, or to the manner of circumstances under which the position held is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.' " *Johnson v. City of Port Arthur*, 892 F.Supp. 835, 842 (E.D.Tex.1995) (quoting 29 C.F.R. § 1630.2(*o*)(1)(ii)). In order to defeat summary judgment, Munoz must proffer evidence that he was able to perform the essential functions of his job with reasonable accommodation. *See Milton*, 53 F.3d at 1124; *White*, 45 F.3d at 362. " 'Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate.' " *Milton*, 53 F.3d at 1124 (quoting *White*, 45 F.3d at 361).

▆▆▆ The ADA does not require an accommodation that would result in other employees having to work harder or longer hours. *Id.* at 1125 (citing C.F.R. § 1630.2(p)(2)(v)). Boedeker testified that H & M could not operate with only one oil delivery driver. According to Munoz's testimony, even with two full-time oil delivery drivers, he was sometimes required to work overtime. With Munoz unable to work, the other truck driver and employees had to pick up Munoz's workload. This clearly resulted in other employees having to work longer and harder hours. *See id.*

Furthermore, the term "qualified individual with a disability," as used in the ADA, does not refer to an employee's *future* ability to perform the essential functions of his position. *Myers*, 50 F.3d at 283. Instead, the provisions of the ADA are "formulated entirely in the present tense, framing the precise issue as whether an individual 'can' (not

'will be able to') perform the job with reasonable accommodation." *Id.* Reasonable accommodation does not require the defendant to wait indefinitely for the plaintiff's medical condition to be corrected. *Id.* (citing *Fuller v. Frank*, 916 F.2d 558, 562 (9th Cir.1990)). At the time of his termination, Bailey had not released Munoz to return to work in any capacity. Because it was not known when Munoz would be able to resume his duties as oil delivery driver, it would be unreasonable to expect H & M to hold Munoz's job open for an indeterminate period, requiring other workers to pick up his workload. Instead, it was proper for H & M to fill the truck driver position with a qualified driver in order to continue to provide the same level of services to its customers.

Munoz claims that H & M failed reasonably to accommodate him by not providing him a "light duty" job. When Munoz was terminated, however, he had not been released by his doctor to work even a light duty job. Under the ADA, reassignment to a vacant position may be considered a reasonable accommodation. *Daugherty v. City of El Paso*, 56 F.3d 695, 698 (5th Cir.1995) (citing 42 U.S.C. § 12111(9)); *see also White*, 45 F.3d at 362 (citing 29 C.F.R. § 1630.2(*o*)(2)(ii)); *Turco*, 906 F.Supp. at 1131. The ADA, however, does not require an employer to promote a disabled employee, nor must an employer reassign the employee to an occupied position or create a new position to accommodate the disabled worker. *White*, 45 F.3d at 362 (citing 29 C.F.R. § 1630, App. 1630.2(*o*)); *see also Chiari*, 920 F.2d at 319; *Johnson*, 892 F.Supp. at 842; *Emrick v. Libbey–Owens–Ford Co.*, 875 F.Supp. 393, 397 (E.D.Tex.1995). "Changing movant from a laborer to a 'light duty' worker is not a reasonable accommodation to assist in the performance of his job; it is a completely different job. It is a change in the essential functions of the employment." *Johnson*, 892 F.Supp. at 842. Both Walker and Boedeker testified that there were no light duty positions available at H & M. Munoz has not refuted this. In fact, Munoz stated in the workers' compensation forms at Dr. Bailey's office that there were no light duty positions available. Even if there had been a "light duty" position available at the

time of his termination, H & M had no obligation to transfer Munoz to a completely different position, especially in view of the fact that he had not obtained a release from his doctor to return to work in any capacity.

Munoz asserts that even if no light duty jobs were available at H & M, he should have been transferred to Max Food Mart. While "reassignment" as a method of accommodation does not mean that the employer has a statutory obligation to transfer the employee, the employer may be required to transfer the employee to another facility in situations where it is the regular practice of the employer to transfer employees between facilities. *Emrick*, 875 F.Supp. at 398. Here, Boedeker testified that certain individuals— Donna Watkins, Linda Bird, and Warren McIver—work for both H & M and Max Food Mart. Even if it were the practice of H & M to transfer employees to Max Food Mart, however, both Walker's and Boedeker's unrefuted testimony establishes that there were no "light duty" positions available at Max Food Mart at the time. Munoz has offered nothing beyond his own subjective opinion that he could perform various jobs at Max Food Mart at the time of his termination, which is insufficient to defeat summary judgment. *See White*, 45 F.3d at 362.

Hence, as there was no reasonable accommodation available at the time of his termination, Munoz has failed to show that he was an "otherwise qualified individual" under the ADA. Accordingly, Munoz has not satisfied the second element of a *prima facie* case of handicap discrimination. Because Munoz's claim fails on this element, there is no need to address the remaining elements of an ADA claim.

### C. *Workers' Compensation Discrimination*

Section 451.001 of the Texas Labor Code contains a statutory exception to the Texas common law, employment-at-will doctrine. *See Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 588 (5th Cir.1995); *Swearingen v. Owens–Corning Fiberglas Corp.*, 968 F.2d 559, 561 (5th Cir.1992). The statute prohibits an employer from discharg-

ing or discriminating against an employee because the employee has filed a workers' compensation claim in good faith. Tex.Lab. Code Ann. § 451.001; *Burfield,* 51 F.3d at 588; *Graef v. Chemical Leaman Tank Lines,* 860 F.Supp. 1170, 1173 (E.D.Tex.1994). Specifically, the statute provides that:

[a] person may not discharge or in any other manner discriminate against an employee because the employee has

(1) filed a workers' compensation claim in good faith;

(2) hired a lawyer to represent the employee in a claim;

(3) instituted or caused to be instituted in good faith a proceeding under Subtitle A; or

(4) testified or is about to testify in a proceeding under Subtitle A.

Tex.Lab.Code Ann. § 451.001; *see Swearingen,* 968 F.2d at 561. The Texas Legislature enacted § 451.001 "to protect persons who are entitled to benefits under the Worker's Compensation Law and to prevent them from being discharged by reason of taking steps to collect such benefits." *Mills v. Injury Benefits Plan of Schepps–Foremost, Inc.,* 851 F.Supp. 804, 807 (N.D.Tex.1993); *Carnation Co. v. Borner,* 610 S.W.2d 450, 453 (Tex. 1980); *Texas Steel Co. v. Douglas,* 533 S.W.2d 111, 115 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.).

▆▆▆ In pursuing a claim under § 451.001, the plaintiff has the burden of establishing a causal nexus between the filing of a workers' compensation claim and his discharge or other adverse action taken by his employer. *Parham v. Carrier Corp.,* 9 F.3d 383, 386 (5th Cir.1993); *Swearingen,* 968 F.2d at 562; *Jones v. Roadway Express, Inc.,* 931 F.2d 1086, 1090 (5th Cir.1991). The plaintiff need not prove that his quest for workers' compensation was the sole reason for his discharge, but he must establish that it was a determining factor. *Parham,* 9 F.3d at 387; *Pope v. MCI Telecommunications Corp.,* 937 F.2d 258, 265 (5th Cir.1991), *cert. denied,* 504 U.S. 916, 112 S.Ct. 1956, 118 L.Ed.2d 558 (1992); *Roadway Express, Inc.,* 931 F.2d at 1090; *Azar Nut Co. v. Caille,* 720 S.W.2d 685, 687 (Tex.Civ.App.—El Paso 1986), *aff'd,* 734 S.W.2d 667 (Tex.1987). The

Texas Supreme Court recently held that the standard of causation in whistleblower and similar discrimination cases, including cases under § 451.001, "should be the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did;" however, the employee need not prove that it was the sole reason for the employer's adverse action. *Texas Dept. of Human Servs. v. Hinds,* 904 S.W.2d 629, 634, 636 (Tex.1995). Once the plaintiff has shown a causal link, the employer may rebut the plaintiff's showing by demonstrating that the discharge was actually for a reason unrelated to the plaintiff's pursuit of workers' compensation benefits. *Swearingen,* 968 F.2d at 562; *Roadway Express, Inc.,* 931 F.2d at 1090; *Hughes Tool Co. v. Richards,* 624 S.W.2d 598, 599 (Tex.Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982).

▆▆▆ Texas courts have held that an action under § 451.001 is viable in situations where an employee was discharged before filing a claim for compensation benefits. *See Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 84 (Tex.App.—El Paso 1992, no writ); *Mid–South Bottling Co. v. Cigainero,* 799 S.W.2d 385, 389 (Tex.App.—Texarkana 1990, writ denied). In some cases, notifying an employer of an on-the-job injury is enough to support a finding that an employee had "instituted a proceeding" under the Act. *See Mid–South Bottling Co.,* 799 S.W.2d at 389; *Hunt v. Van Der Horst Corp.,* 711 S.W.2d 77, 79–80 (Tex. App.—Dallas 1986, no writ). Such an action constitutes an affirmative step toward instituting a proceeding. *Worsham Steel Co.,* 831 S.W.2d at 84. To hold otherwise would be " 'to reward employers who are particularly adept at anticipating and quick in firing potential workers' compensation claimants over those who are slower to retaliate.' " *Id.* (quoting *Hunt,* 711 S.W.2d at 80); *see also Borden, Inc. v. Guerra,* 860 S.W.2d 515, 521 (Tex.App.—Corpus Christi 1993, writ dism'd); *Mid–South Bottling Co.,* 799 S.W.2d at 389.

▆▆▆ An employee may show causation by direct or circumstantial evidence, includ-

ing the reasonable inferences that may be drawn from such evidence. *Investment Properties Management v. Montes,* 821 S.W.2d 691, 694 (Tex.App.—El Paso 1991, no writ); *see Palmer v. Miller Brewing Co.,* 852 S.W.2d 57, 60 (Tex.App.—Fort Worth 1993, writ denied); *Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.—El Paso 1989, writ denied). Such evidence includes: (1) knowledge of the claim by those making the decision to terminate; (2) a negative attitude toward the employee's injured condition; (3) failure to follow company policy when disciplining an employee who made a claim for workers' compensation; and (4) discriminatory treatment of the employee when compared to the treatment of other employees with the same disciplinary problem. *Palmer,* 852 S.W.2d at 60–61; *Paragon Hotel Corp.,* 783 S.W.2d at 658.

■ An employer is entitled to summary judgment in a retaliatory discharge suit brought by an employee who has filed a workers' compensation claim when the employer establishes a legitimate, nondiscriminatory reason for the discharge and the employee fails to produce any evidence of a retaliatory motive. *See Texas Division–Tranter, Inc. v. Carrozza,* 876 S.W.2d 312, 313 (Tex.1994). Even if presented in affidavit form, the plaintiff's "subjective beliefs are no more than conclusions and are not competent summary judgment evidence." *Id.* at 314.

In *Burfield,* the Fifth Circuit rejected a § 451.001 claim, explaining that assuming a "clear anger" existed in the statements made regarding the plaintiff's filing of a claim, the statements were made approximately fifteen to sixteen months before the employee was terminated. 51 F.3d at 589. The court noted that "while the length of time between these statements and the termination is not the determining factor, Texas courts have frequently looked at the temporal proximity between the protected activity and the adverse employment action for circumstantial evidence of retaliatory motive." *Id.* at 590 (citing *Worsham Steel,* 831 S.W.2d at 82); *Chemical Express Carriers, Inc. v. Pina,* 819 S.W.2d 585, 590 (Tex.App.—El Paso 1991, writ denied).

■ In this case, Munoz bases his retaliatory discharge claim on the knowledge H & M had of his injury and the "negative attitude" exhibited by H & M "towards workers' compensation claims." After the injury and before he was terminated, Denise went to H & M's office to inquire about insurance payments for medical expenses. According to Denise's affidavit, Bird told her that it would have been better if Munoz had just claimed his back injury on his personal health insurance rather than filing a workers' compensation claim. Munoz contends that Bird implied that the company was unhappy with his workers' compensation filing. Munoz also refers to a previous injury he suffered while on the job where Warren McIver, H & M's manager, reportedly told him not to file a workers' compensation claim, stating unequivocally that Walker did not want anyone to file workers' compensation claims and that anyone who did would be fired. Munoz did not file a workers' compensation claim for that injury. Munoz also claims that, Sikorski, a co-worker, told him "not to ever file a workers' compensation claim." Finally, Munoz relies on his conversation with Boedeker on the day he was terminated when Boedeker told Munoz he was being discharged because H & M was afraid he would reinjure his back.

H & M asserts that Munoz was terminated because he was no longer able to perform the essential functions of his job and because there were no "light duty" positions available at the time. The statements reportedly made by the office manager and Boedeker, as well as the close proximity between his filing of the workers' compensation claim and his termination raise a fact question as to whether, without the filing of a workers' compensation claim, Munoz would have been terminated. Munoz has produced evidence from which it could be inferred that the requisite causal link exists between his pursuit of workers' compensation benefits and his discharge. Thus, summary judgment on Munoz's claim of retaliatory discharge under § 450.001 is not proper.

D. *Intentional Infliction of Emotional Distress*

■ To prevail on their claim of intentional infliction of emotional distress, the Mu-

nozes must establish: (1) the defendant acted intentionally or reckless; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused them emotional distress; and (4) the emotional distress suffered by them was severe. *MacArthur v. University of Tex. Health Ctr.*, 45 F.3d 890, 898 (5th Cir.1995); *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 742 (5th Cir.1993), *cert. denied*, 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994); *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993); *Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1375 (5th Cir.1992); *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 33 (5th Cir.1992); *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir.1989); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex.1993)); *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

▉▉▉ While "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See MacArthur*, 45 F.3d at 898; *Ugalde*, 990 F.2d at 243; *Johnson*, 965 F.2d at 33; *Dean*, 885 F.2d at 306; *Randall's Food Mkts., Inc.*, 891 S.W.2d at 644; *Wornick*, 856 S.W.2d at 734. In *Dean*, the Fifth Circuit (citing RESTATEMENT (SECOND) OF TORTS § 46, comment d (1965)) stated:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Ugalde*, 990 F.2d at 243; *Johnson*, 965 F.2d at 33; *Wilson v. Monarch Paper Co.*, 939

F.2d 1138, 1143 (5th Cir.1991). There is no occasion for the law to intervene in every case where someone's feelings are hurt. *Id.*

▉▉▉ Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for "mere employment disputes." *MacArthur*, 45 F.3d at 898; *Johnson*, 965 F.2d at 33. The courts recognize that in order to manage its business properly, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *Id.* at 34; *Wilson*, 939 F.2d at 1143. Even actions that may be illegal in an employment setting may not be the sort of behavior that constitutes "extreme and outrageous" conduct for purposes of an intentional infliction of emotional distress claim. *Ugalde*, 990 F.2d at 243; *see Sebesta v. Kent Elecs. Corp.*, 886 S.W.2d 459, 462–63 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

▉▉▉ In its motion for summary judgment, H & M addresses the second element of a claim for intentional infliction of emotional distress, asserting that its conduct was not "extreme and outrageous" under Texas law. In response, the Munozes argue:

> Mr. and Mrs. Munoz have been seriously harmed by the Defendant's actions. They did not know where or when Munoz would again be employed, or indeed how much his income would be. They have had their telephone disconnected for inability to pay their telephone bill. They have had to suffer anxiety and depression from being unemployed and from being used and discarded like so much merchandise. They have been subjected to tremendous anxiety and uncertainty regarding where the next meal will come from and what, if anything, Munoz will be able to do support his family. This anxiety and uncertainty, when coupled with the Defendant's culpability, calculating conduct, is sufficient to allow a jury to find that the Defendant is liable to the Plaintiff for the intentional infliction of emotional distress.

Clearly, the conduct alleged by the Munozes is far less egregious than other actions found not to constitute intentional infliction of emo-

tional distress as matter of law in a number of cases. *See, e.g., Ramirez,* 970 F.2d at 1376–77; *Johnson,* 965 F.2d at 34; *Guthrie v. Tifco Indus.,* 941 F.2d 374, 379 (5th Cir. 1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Clayton v. Nabisco Brands, Inc.,* 804 F.Supp. 882, 888 (S.D.Tex.1992); *Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361, 369 (Tex. App.—San Antonio 1992, writ denied). Only in the most unusual of situations does conduct move out of the "realm of an ordinary employment dispute," into the classification of "extreme and outrageous," as required for the tort of intentional infliction of emotional distress. *Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir.1994) (quoting *Dean,* 885 F.2d at 305). In essence, the plaintiffs complain of the termination of Munoz's employment. The Munozes' complaints are typical of those experienced by many persons who have lost their jobs.

■■■■ Under Texas law, "[t]he fact of discharge itself as a matter of law cannot constitute outrageous behavior." *Wornick,* 856 S.W.2d at 735. "An employer will not be held liable for exercising its legal right to terminate an employee, 'even though he is well aware that such [action] is certain to cause emotional distress.'" *Johnson,* 965 F.2d at 34 (quoting *Diamond Shamrock Refining & Marketing Co. v. Mendez,* 809 S.W.2d 514, 522 (Tex.App.—San Antonio 1991), *aff'd in part and rev'd in part on other grounds,* 844 S.W.2d 198 (Tex.1992)). Here, Munoz does not allege that he was subjected to insults, degraded, or treated with disrespect. In fact, when informed that he was being terminated, Boedeker inquired how Munoz was faring financially and asked if he needed anything. Moreover, according to Munoz, Boedeker offered to try to find other work for him. H & M's conduct was not so vile or reprehensible to be regarded as atrocious or utterly intolerable in a civilized community. Indeed, the challenged behavior does not even approach the level of "extreme and outrageous" conduct required to support a recovery for intentional infliction of emotional distress under Texas law.

■■■■ Furthermore, the Munozes have made no showing that any emotional distress they suffered was severe. A claim of intentional infliction of emotional distress requires that there be "sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part." *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 944 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.); *see also Badgett v. Northwestern Resources Co.,* 818 F.Supp. 998, 1003 (W.D.Tex.1993). The severity of distress is an element of the cause of action, not merely of the damages. *Benavides v. Moore,* 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied); *K.B. v. N.B.,* 811 S.W.2d 634, 640 (Tex.App.—San Antonio 1991, writ denied), *cert. denied,* 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992).

■■■■ "Emotional distress" means any highly unpleasant mental reaction such as extreme grief, shame, humiliation, embarrassment, anger, disappointment, worry, and nausea. *Behringer v. Behringer,* 884 S.W.2d 839, 844 (Tex.App.—Fort Worth 1994, writ denied); *see also Washington v. Knight,* 887 S.W.2d 211, 216 (Tex.App.—Texarkana 1994, writ denied); *Badgett,* 818 F.Supp. at 1003; *Tidelands Auto. Club,* 699 S.W.2d at 945. In order to recover damages, however, the plaintiff must prove more than mere worry, anxiety, vexation, embarrassment, or anger. *McCray v. DPC Indus., Inc.,* 875 F.Supp. 384, 392 (E.D.Tex.1995) (citing *Regan v. Lee,* 879 S.W.2d 133, 136 (Tex.App.—Houston [14th Dist.] 1994, no writ)); *Haryanto v. Saeed,* 860 S.W.2d 913, 923 (Tex.App.—Houston [14th Dist.] 1993, writ denied). "The law intervenes only where the distress is so severe that no reasonable person should be expected to endure it." *Behringer,* 884 S.W.2d at 844 (citing RESTATEMENT (SECOND) OF TORTS 46, comment j).

■■■■ At deposition, when asked about the emotional distress he has suffered, Munoz responded:

A. Well, when you can't pay your bills, your kids are hungry and your wife needs things, your kids need things, you know, you go through a lot. They're always used to looking to you to get it for them, and you can't do it, you know. That's a lot on you.

Q. So your emotional distress, then, is related to not being able to work and not being able to provide money for your family; is that correct?

A. Yes, ma'am.

Q. Were you ever seen by a doctor about your emotional distress?

A. No.

Q. Did you ever see a psychologist or a psychiatrist?

A. No.

Q. Now that you have returned to work and are able to provide for your family, have those symptoms disappeared?

A. I guess they will always be there.

Q. Why is that?

A. Well, you don't forget about them times, do you? ·

Q. Are you still suffering from emotional distress, Mr. Munoz?

A. Naturally. I mean, its hard to get back on your feet once you establish something.

While the Munozes assert that they have suffered from anxiety and depression, they do not claim to have experienced any psychiatric problems, like those encountered by the plaintiff in *Johnson,* or even debilitating headaches, such as those suffered by the plaintiff in *Clayton,* stemming from the defendant's actions. *See Johnson,* 965 F.2d at 33; *Clayton,* 804 F.Supp. at 885. The Munozes certainly do not claim to be suffering from anything approaching the possibly suicidal, reactive depression experienced by the plaintiff in *Wilson. See Wilson,* 939 F.2d at 1141; *see also Motsenbocker v. Potts,* 863 S.W.2d 126, 135 (Tex.App.—Dallas 1993, no writ); *American Medical Int'l, Inc. v. Giurintano,* 821 S.W.2d 331, 343 (Tex.App.— Houston [14th Dist.] 1991, no writ). The Munozes also have not alleged that they are afflicted with post-traumatic stress syndrome, as diagnosed in *Haryanto. See Haryanto,* 860 S.W.2d at 922. Thus, the Munozes' claimed emotional distress cannot be said to be "so severe that no reasonable [person] could be expected to endure it." *K.B.,* 811 S.W.2d at 640; *Benavides,* 848 S.W.2d at 195.

Hence, the Munozes have failed to adduce sufficient evidence to raise a fact issue with respect to two of the required elements of an intentional infliction of emotional distress claim under Texas law—extreme and outrageous conduct and severe emotional distress. Therefore, summary judgment on this claim is proper.

### III. *Conclusion*

Accordingly, H & M's motion for summary judgment is GRANTED on the Munozes' claims of violations of the ADA and intentional infliction of emotional distress. There exist no outstanding issues of material fact regarding these claims, and H & M is entitled to judgment as a matter of law.

With regard to Munoz's claim of workers' compensation discrimination, however, H & M's motion for summary judgment is DENIED.

IT IS SO ORDERED.