Sheryl C. HENDERSON, Plaintiff,

v.

NEW YORK LIFE, INC., Defendant.

No. Civ.A. 3:96–CV–1046–P.

United States District Court,
N.D. Texas,
Dallas Division.

June 23, 1997.

Kay Lynn Van Wey, Van Wey & Johnson, Dallas, TX, for Plaintiff.

Kenneth E. Gardner, Susman Godfrey, Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the court are the cross Motions for Summary Judgment filed by the parties, their respective briefs in support thereof and opposition thereto, and Defendant's Emergency Motion to Strike Plaintiff's Untimely Response to Defendant's Motion for Summary Judgment. Having considered the argument and authorities, and the record as a whole, the Court finds, for reasons set out below, that Defendant's Motion to Strike should be **DENIED**; Plaintiff's Motion for Summary Judgment should be **DENIED**; and Defendant's Motion for Summary Judgment should be **GRANTED**.

## I. MOTION TO STRIKE UNTIMELY RESPONSE

As an initial matter, the Court addresses Defendant's Emergency Motion to Strike Plaintiff's Untimely Response to Defendant's Motion for Summary Judgment. Pursuant to the Court's scheduling order, the parties were required to file dispositive motions on or before April 15, 1997 and all responses thereto within 15 days of the filing of such motions "to give the Court additional time to rule on any dispositive motions prior to the

pretrial conference." Both parties filed timely motions, and Defendant filed a timely response. Plaintiff, however, filed her response five days late due to alleged inadvertence of counsel. Because no prejudice will result from consideration of the late-filed response, because the filing was not so late as to preclude the Court from ruling on the dispositive motions prior to the pretrial conference, and because consideration of the briefing contained therein aids the Court in reaching its determination, the Court **DENIES** Defendant's Motion to Strike Plaintiff's untimely response.

## II. FACTUAL BACKGROUND

Since 1989, Plaintiff Sheryl Henderson has been employed as a claims examiner for Defendant New York Life, Inc. ("NYL").[1] From 1994 through the present, NYL has employed between 37 and 54 employees in the office in which Henderson works. During that time, Henderson has worked in a large, open area containing cubicle work stations. Henderson's current work area is within a semi-enclosed cubicle, which has one open side, one floor-to-ceiling solid wall, and two partitions approximately 5 feet high. At the time of briefing, no one occupied the adjoining space to Henderson's left. One employee occupied the space to Henderson's right, but was separated from Henderson by one of the 5-foot partitions. As a claims examiner, Henderson's job duties include answering phone calls (including overflow calls from other departments) from insureds and others, providing related customer service, accessing NYL's computer system, using the microfilm machine and the copy machine in processing and paying claims, accessing reference books, participating in meetings held at the office, and consulting confidential medical records required to be maintained in the Dallas office pursuant to NYL's practices, policies, and procedures regarding security of confidential documents. Currently, NYL expects its medical claims examiners to process at least 83 claims per workday, an increase from the 65–70 required during the latter part of 1996.

### A. Medical History

Henderson's medical records indicate that between 1975 and the time of briefing, Plaintiff has suffered from and received medical treatment for allergies, chronic sinusitis, rhinitis and asthma-type systems.[2] Henderson has undergone multiple sinus surgeries. On or about December 20, 1994, Henderson learned that her IgG levels were deficient. Since that time she claims that she suffers from an immune deficiency called Common Variable Immune Deficiency Disorder ("CVIDD"), which reduces her resistance to viruses and bacteria, causes hypersensitivity to various substances, and required her for a time to receive monthly IV gamma

1. In January 1996, as part of a corporate restructuring, Henderson ceased being an employee of NYL and became an employee of NYLCare Health Plans, Inc. ("NYLCare"), a NYL subsidiary. In its Motion for Summary Judgment, Defendant points out that NYL is not a proper defendant with respect to Henderson's ADA claims arising from or in connection with NYLCare's alleged failure to reasonably accommodate Henderson, that Henderson has failed to join NYLCare before the court-ordered deadline, and that NYL would be prejudiced by the joinder of NYLCare at this late date. Henderson contends that NYLCare had actual and constructive notice of Henderson's charge inasmuch as none of the company's pertinent office personnel changed, and Henderson's immediate supervisor, Dallas Office Manager, and Regional Manager remained the same. Moreover, Henderson filed a second charge with the EEOC on March 25, 1997 "to be absolutely sure that NYLCare could not assert lack of notice on her claims." Pl. Brief p. 15. Henderson requests without formal motion leave to amend her pleadings to add NYLCare as a defendant. Because the Court finds that Henderson could not recover on the facts before the Court even with NYLCare's presence as a party, it is unnecessary to address the efficacy of Henderson's second charge as it pertains to, and resolve, the joinder issue. In light of this fact and for ease in writing this memorandum opinion and order, the Court refers hereafter to NYL whenever it describes conduct of either NYL or NYLCare, unless otherwise noted.

2. Henderson testified that she does not currently view her sinus, allergy and rhinitis as problems that interfere with her ability to do her job. Henderson Depo. p. 114. Additionally, in 1989, when she filled out her job application, Henderson represented that she suffered no physical, mental or medical impairments which would interfere with her ability to perform her job. *Id.*

globulin replacement.[3] Henderson has been a chronic smoker since 1969.[4]

On August 19, 1992, Henderson's physician ("Lumry") drafted an open letter which states, in pertinent part:

Ms Henderson has been under care through our clinic for nasal allergies and chronic sinus infection since 1988. Over this time she has had numerous medications and is taking allergy shots to control her symptoms. She is known to be quite sensitive to house dust and mold spores. I have recommended that she maintain as much control over dust in her environment as possible. With excessive dust exposure, her symptoms become uncontrollable with medication and sinus and chest infections result. Any help that you can be in providing Ms. Henderson with a dust-free environment will be greatly appreciated. This should include regular changing of air conditioning and heating filters, appropriate housekeeping in the office and avoidance of exposure to other irritants such as strong odors and cigarette smoke.

Pl.Compl., Ex. A. Henderson testified that she dropped this letter into the in-box of the Office Director employed by NYL at the time. Henderson Depo. p. 147. On February 12, 1994, Lumry wrote another open letter stating:

Ms Henderson has been under my care for nasal allergy, sinus problems and asthma since 1991. Fortunately we have been able to maintain reasonably good control of these conditions with a combination of medical and surgical therapy. She was seen 2/11/94 and complained that her asthma was again worsening. On further questioning she revealed that her asthma is well controlled on the weekends and when she is away from work during the

---

3. NYL disputes that Henderson has CVIDD, but argues that the Court need not address whether Henderson suffers from that condition to rule in its favor.

4. NYL argues, and the record is replete with support, that Henderson's chronic smoking contributes significantly to the breathing and infection problems which she attributes to her work environment and her immune deficiency, and that every one of her many treating physicians has urged her unsuccessfully to quit. Two of Henderson's physicians state:

I think [Henderson's chronic smoking] plays a significant role.... We know very well that individuals that smoke cigarettes, we know very well that individuals that have chronic allergies are more—are predisposed to having infections more readily than individuals who don't smoke and who don't have allergies. So her sort of—another line of defense is broken down.... Cigarette smoking does a very good job of paralyzing [her cells'] cilia, so that mucous doesn't move, it stays where it is longer and the bacteria and the viruses and the particles that are irritating to the lungs stay there and have more of a chance, if you will, to set up an infection than they do in individuals that have active cilia transport systems. It's a big problem for her.

Lumry Depo., pp. 48–50.

"I have told the patient she must stop smoking. This is most likely the irritant causing this chronicity of sinusitis and asthma." Med. Record of Lanny Close, M.D. dated 5/13/88 (Ex. 13 to Def. Opp. to Pl. Motion).

[Henderson] has smoked in the past and is trying to stop. In addition, she lives with a smoker who smokes in her presence. I have warned her about the risks of this, since my examination of her nose confirms that the mucous membranes are all dry and chronically inflamed with no evidence of normal mucociliary activity.

Close Letter to Lumry dated July 17, 1992 (Ex. 13 to Def. Opp. to Pl. Motion).

While it would appear that Henderson should not be allowed to benefit from impairing herself, the EEOC Compliance Manual states:

Voluntariness is irrelevant when determining whether a condition constitutes an impairment. For example, an individual who develops lung cancer as a result of smoking has an impairment, notwithstanding the fact that some apparently volitional act of the individual may have caused the impairment. *See* House Judiciary Report at 29 (noting that '[t]he cause of a disability is always irrelevant to the determination of disability'); *see also Cook v. State Dept. of Mental Health, Retardation and Hosp.*, 10 F.3d 17 (1st Cir.1993).

EEOC Compliance Manual Section 902.2(e).

NYL does not argue that Henderson's cigarette abuse caused her immune disorder, but rather that it may be the cause of the symptoms which Henderson attributes to that disorder, i.e., increased infections, sinusitis, rhinitis, and asthma. Thankfully, the Court need not walk the tightrope of reviewing such evidence without violating the prohibition against weighing it in the context of summary judgment. Even considering all the medical evidence in the light most favorable to Henderson, the Court concludes that she cannot recover under the ADA on the record before the Court.

week but worsens upon return to the work place. She attributes this to the heavy dust load in the office. In the interest of Ms. Henderson's improved health as well as the health of other employees I would recommend your air conditioning and heating system be thoroughly inspected. It appears that it is in some way being contaminated with a substance that may be causing respiratory difficulty in susceptible patients.[5]

Pl.Compl., Ex. B. After Henderson presented this letter to NYL, Robert Bycott, the current Office Director, drafted a memo memorializing that he met with the building management to discuss the heating and air conditioning system in light of Henderson's problems. Bycott Depo., Ex. 3. The memo indicates that Bycott was advised that the air filters in the building were kept clean and inspected frequently, that the system was up to standards and that management had reports to substantiate that claim, and that the heating and air was not turned off on weekends. Id.[6] Finally, the memo indicates that Bycott shared this information with Henderson. Id.

On December 20, 1994, Dr. Hendler wrote an open letter, stating that Henderson "was

noted to have low total IgG levels when evaluated by a rheumatologist for her arthritis and recurrent infections.... [She] has had recurrent, almost constant sinusitis when off antibiotics.... [She] has had three sinus surgeries which have not helped.... This is merely a letter substantiating her IgG deficiency." Pl.Compl., Ex. C. Henderson testified that the only letters she presented to NYL were the August 19 and February 12 letters from Lumry. Henderson Depo. p. 196.

On or before October 16, 1995, Henderson received from NYL an Invitation to Self–Identify [7] which she completed and in which she states when asked to describe the accommodation(s) that would enable her to perform her job safely and properly:

Immune Deficiency causes increased hypersensitivity to chemicals and reduced resistance to viruses and bacteria causing frequent infection. Work station away from others or working at home and installation of electrostatic air cleaners to filter out impurities, if not at home.

Pl.Compl., Ex. D. In response to the form's request to indicate any accommodations currently being made, Henderson stated:

---

5. The evidence indicates that Lumry's statements regarding alleged conditions at the office and his letter's implication that other employees may be suffering are based entirely on representations made by Henderson to Lumry, which representations Henderson later indicated under oath to be false. Lumry Depo. pp. 71–72; 106–08; Pl. First Suppl. Answer to Interrog. # 11, Ex. 6 to Def. Opp. to Pl. Mtn.

6. The evidence indicates that on March 6, 1997, a certified industrial hygienist performed an air quality inspection of Henderson's work premises at NYL's behest and that, after conducting various tests, he found the air quality met or exceeded various indices for the measurement of indoor air quality. Affid. of William R. Vining, Jr., Def. Opp. to Pl. Mtn., Ex. A. Moreover, he found that the air quality in the enclosed offices at the premises was not significantly different from the air quality in the open office space in that the HVAC system circulated the same air throughout all offices on the floor whether open or closed. Id.

7. The form which Henderson completed was titled: "Invitation to Self–Identify For Individuals With Disabilities, Special Disabled Veterans and Vietnam Era Veterans" which was addressed to

"All U.S. Employees" and which stated, in pertinent part:

As a government contractor, New York Life is required to take affirmative action to employ, and advance in employment, qualified disabled individuals, special disabled veterans, and veterans of the Vietnam era. This action is required by the Rehabilitation Act of 1973 and the Vietnam Era Veterans Readjustment Assistance Act of 1974.

If you are a special disabled veteran and/or Vietnam era veteran or are an individual with a disability, and you would like to be considered under our Affirmative Action Plan, please complete the Invitation to Self–Identify form on the reverse side of this page and send it to the EEO Unit, Home Office, Room 508. This information is voluntary and failure to provide it will not subject you to any harassment, corrective action, or termination. The information you provide will be kept confidential, except that:

a. Supervisors and managers may be informed of work or duty restrictions and/or necessary accommodations for disabled veterans and other individuals with disabilities[.]

Pl.Compl., Ex. D.

"None, all requests by myself and my doctors have been ignored. I currently am purchasing masks to work, at my own expense."[8] Henderson testified that she mailed the completed form to NYL's Home Office in New York, as directed on the form, and that she did not forward a copy to, or independently inform, anyone at the Dallas Office. Henderson Depo. p. 182; Bycott Depo. p. 79.

The evidence is conflicting whether Henderson made a request orally before November 15, 1995, but it is clear that as of that date, Henderson requested in writing that her work station be moved away from air vents due to her "major sinus and breathing problems."[9] Henderson was moved to a location away from the air vents on December 5, 1995, four days after she filed a charge with the Equal Employment Commission ("EEOC"), unbeknownst to NYL, claiming she was discriminated against due to a disability.[10]

8. Henderson has since testified that at the time she filled out the form, she had not, in fact, requested such an accommodation. Indeed, other than "mentioning to [Bycott] about having the air tested," Henderson had made no requests for accommodation of NYL at the time. Henderson Depo. pp. 194–95. Additionally, Lumry testified that he never directed or urged Henderson to wear surgical masks at any time. Lumry Depo. p. 46. While Henderson bases her intentional infliction of emotional distress action in part on the assertion that she was forced to wear masks to work, she admits that no one told her to wear them. Henderson Depo., p. 237. The evidence indicates that Henderson wears the masks to work only, and chooses not to wear them at other locations where she is exposed to groups of people, such as supermarkets and doctors' offices. Henderson Depo. pp. 187–93. Moreover, the evidence indicates that, while under surveillance by a private investigator, Henderson visited locations that were crowded and where, due to heavy traffic and fueling of vehicles, Henderson was exposed to exhaust and fumes. Affid. of L.E. Jack Driscoll, Def. Opp. to Pl. Mtn., Ex. D. Additionally, Henderson spent approximately 41 minutes inside a smoke-filled club. *Id.* At no time during the observation did Henderson wear her mask. *Id.*

9. On the same day, Bycott drafted a memo to the file which states:
   On November 14, 1995, while discussing seating assignments in the Dallas office, Theda Doles, [Henderson's] Supervisor, mentioned that while discussing where [Henderson] would be moved [Henderson] claimed that she had previously told me that sitting under the air vents was causing her medical problems

### B. The EEOC Charge

The charge indicated that the earliest and latest date discrimination took place was October 16, 1995, and represented that "I am being denied a reasonable accommodation, i.e., in that I am not allowed to move from under some air ducks [sic], due to my disability." Def. Opp. to Pl. Mtn., Ex. 7. Henderson has since testified under oath that as of October 16, she had not made any request of NYL to be moved away from air ducts, notwithstanding having declared under penalty of perjury at the time the form was completed that the representations contained therein were true and correct.[11] Henderson Depo. pp. 205, 208. The affidavit which Henderson made in connection with her EEOC charge states:

> In December of '94 I was diagnosed with an immune deficiency called Common Vari-

and that she had requested a move. I immediately requested [Henderson] to come to my office and had ... Doles and Cindy Grubbs [Bycott's assistant] ... sit in on my meeting with [Henderson]. I specifically asked [Henderson] if she had ever requested to be moved. She indicated that she had never made such a request. Because of [Henderson's] continued medical problems I felt it was necessary to clear this matter immediately and to document the personnel file. I advised [Henderson] that I would meet with the building to determine which vents in the office were return vents and which were for heating and air and would arrange to move her as soon as possible.
Bycott Depo. Ex. 6. Henderson testified that everything Bycott wrote in this memo was correct. Henderson Depo. p. 203.

10. After NYL moved Henderson away from the air ducts, as she requested, another work space became available with the departure of an employee. Henderson Depo. pp. 97–99; Bycott Depo. pp. 153–54. This work station was located much nearer an air vent which recirculated the air from the entire office. *Id.* Henderson requested to be moved there, despite being warned that she would be nearer to what she complained of as a problem. *Id.*

11. It appears that the choice of October 16 as the relevant date of discrimination pertains to the date Henderson completed the Invitation to Self-Identify. In the Invitation, Henderson makes no mention of her desire to be moved away from any air ducts, nor does she state that she requested same of NYL. Pl.Compl., Ex. D.

able Immune Deficiency Disorder for which I must have monthly IV gamma globulin replacement for the rest of my life.[12] This condition reduces my resistance to bacteria and viruses and causes hypersensitivity to various substances. On numerous occasions, I have requested that my manager have the air tested in our office because in addition to the above I also suffer from asthma which upon entering our office weekly becomes severe resulting in my being unable to breathe even with the various medication prescribed by my physicians. Unfortunately this has progressed to the point where my ability to breath [sic] is now affected both on and off the job.

Henderson Depo. Ex. 23. On the same day that Henderson's work station was moved away from the air vents, Dr. Lumry wrote a final open letter documenting Henderson's

problems associated with her immune system. She has an immune deficiency (not AIDS) that is associated with an inability to fight off infections efficiently. She is getting infected repeatedly in her work situation and I have suggested that she be placed in a separate office, if possible. This hopefully would decrease her exposure to viral and bacterial infections in the office and allow her to be sick less often and therefore more productive.

Pl.Compl., Ex. E.

### C. The Litigation

On April 16, 1996, Henderson filed her Original Complaint in this court, alleging violations of the Americans With Disabilities Act ("ADA"); negligent training, negligent supervision and negligent retention; and intentional infliction of emotional distress. In support thereof, Henderson relies on Lumry's three letters, Hendler's December 20 letter, the EEOC charge filed on December 1, 1995, and the statements made in the Invitation to Self–Identify.

On September 26, 1996, Bycott wrote a memo to the file regarding Henderson's request to work at home, which states:

On this date with Cindy Grubbs as a witness I held a meeting with [Henderson] to discuss her request to work at home as outlined in a letter from Dr. Lumry. Prior to starting, [Henderson] indicated a copy of this letter was sent to NYL ... and to NYLCare.... I advised [Henderson] that with home office review we would be unable to provide her the opportunity to work at home processing claims. I indicated that because she would not be able to fully complete all her duties and due to confidentially [sic] of medical information we were not approving her request. I then explained to her that since the Dr. indicated he wanted to limit her exposure to her current office building for a period of one month that we could offer her the opportunity to work in our Irving office. [Henderson] indicated this was not acceptable since her Dr. wanted to limit her exposure to any work environment as being around other people caused her to become ill. I explained to [Henderson] the Dr. did not indicate this is [sic] his letter of 8–26–95 but that regardless we would be unable to comply with a request to work at home. [Henderson] then asked about medical leave, and I explained the companies [sic] program and offered her the opportunity to file a claim for medical disability. Approx. 1 hour later [Henderson] placed on my desk a request to begin medical leave on 9–30–96 and to provide her with the necessary paperwork. I met with [Henderson] and provided her with the forms and explain [sic] they should be filed immediately with our Freehold claim office.

Bycott Depo. Ex. 9.

On March 25, 1997, Henderson filed a second charge with the EEOC, indicating that the date the earliest discrimination took place was 10/23/95 and latest was "present," and stating: "I am being denied a reasonable

---

12. The evidence indicates that Henderson did receive such treatments for a specified time, but that discontinuation of the treatments was recommended because they ceased to be warranted or effective. Letter to Lumry dated March 15, 1996 in Def. Opp. to Pl. Mtn. at Ex. 10; Expert Report of Dr. Stuart Abramson, *Id.* at Ex. F–1. As of April 16, 1996, Henderson represented that she was still receiving this therapy. Pl.Compl. Para. 14.

accommodation, i.e., in that I am not allowed to move into an enclosed office space or to work from home on a part or full time basis due to my disability. . . . No reason has been provided for denying me a reasonable accommodation." Pl. Brief In Supp. of Resp., Ex. A–6. Henderson received her right to sue letter for this second charge on or about April 28, 1997. *Id.* at Ex. A–8.

The parties have moved for summary judgment, each claiming entitlement to judgment in their favor on all counts.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. Proc. 56(c), *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thomas v. Harris County,* 784 F.2d 648, 651 (5th Cir.1986). Material facts are facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence and the inferences to be draw therefrom must be viewed in the light most favorable to the party opposing the motion. *Marshall v. Victoria Transp. Co.,* 603 F.2d 1122, 1123 (5th Cir.1979).

The party defending against a motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a jury might return a verdict in his favor. *Anderson,* 477 U.S. at 256–57. Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory statements unsupported by evidentiary facts will not defeat a motion for summary judgment. *Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49 (2d Cir.1985);

*Morton v. GTE North Inc.,* 922 F.Supp. 1169, 1181 (N.D.Tex.1996), *aff'd,* 114 F.3d 1182 (5th Cir.1997). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson,* 477 U.S. at 248–50. Nor may the nonmovant rest on mere allegations or denials in its pleadings; in short, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Merely colorable evidence or evidence not significantly probative will not defeat a properly supported motion for summary judgment. *Id.*

When the nonmoving party fails to make the requisite showing and the moving party has met his summary judgment burden, the movant is entitled to summary judgment. Fed.R.Civ.P. 56(c); *Campbell v. Sonat Offshore Drilling,* 979 F.2d 1115, 1119 (5th Cir. 1992). *Coghlan v. H.J. Heinz Co.,* 851 F.Supp. 808, 811 (N.D.Tex.1994). Moreover, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23. The court has no duty to search the record for triable issues. *Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 402 (6th Cir.1992). The court need only rely on the portions of submitted documents to which the nonmoving party directs. *Id.* at 403.

### IV. CAUSE OF ACTION UNDER "ADA"

The ADA prohibits employers like NYL from discriminating against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, hiring, advancement, or discharge of employees. 42 U.S.C. § 12112(a); *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1092 (5th Cir.1996). "Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential function of such position." 29 C.F.R.

§ 1630.2(m). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. [It] does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

A "disability" includes "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual." 42 U.S.C. § 12102(2). *Turco,* 101 F.3d at 1092. "Physical impairment" includes "[a]ny physiological disorder or condition ... affecting ... the following body systems: neurological, ... special sense organs, respiratory, ... and endocrine." 29 C.F.R. § 1630.2(h)(1). "Substantially limits ... means ... [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i)–(ii); *Robinson v. Global Marine,* 101 F.3d 35, 36 (5th Cir.1996), *cert. denied* — U.S. —, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). Factors to be considered in determining whether an individual is substantially limited in a major life activity include: "[t]he nature and severity of the impairment, (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i)–(iii).

"Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *Robinson,* 101 F.3d at 36. "With respect to the major life activity of working ... [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i), *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 190 (5th Cir.1996); *Maulding v. Sullivan,* 961 F.2d 694, 698 (8th Cir.1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993). Moreover, the inability to perform in a specific environment, coupled with the ability to perform outside that environment, does not satisfy the substantial limitation requirement. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723–24 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995) (applying analogous Rehabilitation Act); *Mobley v. Board of Regents of the Univ. System of Georgia,* 924 F.Supp. 1179, 1187 (S.D.Ga.1996). To determine whether a person is substantially limited in a major life activity other than working, we look to whether that person can perform the normal activities of daily living. *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995). *Dutcher* makes clear that inability to perform [a] discrete task does not render a person substantially limited in a major life activity. *Id.; Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996). "[T]he EEOC's Interpretive Guidelines proclaim that an individual's ability to perform the major life activity of working should only be considered if the individual is not substantially limited in any other major life activity, 29 C.F.R. Part 1630, Appendix § 1630.2(j) ...." *Barfield v. Bell South Telecommunications, Inc.,* 886 F.Supp. 1321, 1324 (S.D.Miss.1995).

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation means ... [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position ...." 29 C.F.R.

§ 1630.2(*o*)(1)(i)–(ii). "Reasonable accommodation may include but is not limited to ... [m]aking existing facilities used by employees readily accessible to and usable by individuals with disabilities, and [j]ob restructuring, part-time or modified work schedules; reassignment to a vacant position; [and] acquisition or modifications of equipment or devices ...." 29 C.F.R. § 1630.2(*o*)(2)(i)–(ii).

"Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of ... [t]he nature and net cost of the accommodation needed ... [and] [t]he impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business." 29 C.F.R. § 1630.2(p)(1)–(2)(i) & (v).

### A. "Disability"

■ Because Henderson has indicated that her sinus, allergy and rhinitis problems do not interfere with her job (see footnote 2), the Court will review only Henderson's asthma and CVIDD facts under the applicable law.[13]

To survive NYL's summary judgment motion, Henderson must meet the threshold burden of establishing that she is disabled under the statute. *Roth v. Lutheran General Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995); *Schluter v. Industrial Coils, Inc.*, 928 F.Supp. 1437, 1443 (W.D.Wis.1996). A diagnosis is relevant to determining whether a charging party has an impairment. It is important to remember, however, that a diagnosis may be insufficient to determine if

the charging party has a disability. An impairment rises to the level of a disability when it substantially limits one or more major life activities.... Further, a characteristic predisposition to illness or disease is not an impairment. 29 C.F.R. pt. 1630 app. sec. 1630.2(h); *Patrick v. Southern Co. Services*, 910 F.Supp. 566, 568 (N.D.Ala.1996), *aff'd*, 103 F.3d 149 (11th Cir.1996).

Regarding her asthma and/or CVIDD, Henderson alleges that she is 75–80% more likely to become ill than the average person, that it takes her longer to get well than the average person, and that, as a result, she would be either less productive or absent from work more often than the average person. Lumry Depo. pp. 19, 141, 178–80. Henderson has failed to show, however, that her lack of productivity while ill differs from the average person's lack of productivity while ill. *See* Lumry Depo. p. 179–80. This evidence proves only that Henderson is impaired; it does not prove she is disabled under the statute. *See Robinson*, 101 F.3d at 37. In *Robinson*, the plaintiff established that his asbestosis caused him to have a lung capacity less than 50% of normal. *Id.* He failed, however, to proffer evidence on how this lower lung capacity actually restricted him as to the condition, manner or duration under which he could breathe. *Id.* The Court stated: "While this may be evidence of an impairment, the fact of a lower lung capacity is not evidence of a disability." *Id.*

Similarly, in *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 191 n. 3. (5th Cir.1996), the Court stated: "[I]t is undisputed that Ellison's cancer [is] an impairment, but, '[a] physical impairment, standing alone, is not necessarily a disability as contemplated by

---

**13.** Henderson has testified that she is able to perform her job notwithstanding having CVIDD. Henderson Depo. pp. 114–116; 119–120. As a result, it would seem that Henderson is not disabled. *See Castle v. Bentsen*, 867 F.Supp. 1, 2 (D.D.C.1994), *aff'd*, 78 F.3d 654 (D.C.Cir.1996). Conversely, NYL argues that if Henderson claims she cannot perform her job unless she is isolated from other people, Henderson is not a "qualified individual" with a disability because the essential functions of her job requires her to interact with people at the office. Bycott Depo. pp. 100–01, 112–13, 116–19; Doles Depo. pp. 62–63, 89, 114–118, 139–41. The Court finds Defendants arguments persuasive, particularly in light of the

absence of evidence that Henderson has **actually** experienced substantial limitations on her ability to work or breathe. Instead, Henderson's evidence indicates a **predisposition** toward or greater likelihood of experiencing illness. As noted later in this opinion, the law indicates that this evidence of an underlying impairment does not constitute evidence of substantial limitation of a major life activity. The other abilities cited by Henderson, e.g., the ability to concentrate, to do daily light tasks, and to have prolonged interaction with large groups of people, are not recognized major life activities under the statute. *See* 29 C.F.R. § 1630.2(i); *Robinson*, 101 F.3d at 36.

the ADA [because t]he statute requires an impairment that substantially limits one or more of the major life activities.'" *See also Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996) (mere existence of a 13% permanent, partial disability does not demonstrate that Rogers has been substantially impaired from performing a major life activity); *Emery v. Caravan of Dreams, Inc.*, 879 F.Supp. 640, 642–43 (N.D.Tex.1995) (Plaintiff suffering from asthma and allergies to tobacco, ragweed, pollen, and dust mites not "person with disability" under ADA where testimony showed plaintiff not substantially impaired in ability to work, recreate, breathe or have normal life).

The law does not require NYL to assume that because Henderson has an impairment, she must, therefore, be substantially impaired in her ability to perform her job. *See Robinson*, 101 F.3d at 37; *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 163 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996); *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996), *Ellison*, 85 F.3d at 191 n. 3. As a result, it is important to distinguish between evidence of an underlying impairment and evidence that the impairment substantially limits a major life activity.

### B. "Substantially Limits Major or Life Activity"

To establish that she is disabled, then, Henderson must prove that her impairment has substantially limited a major life activity, She alleges that, due to her asthma and/or CVIDD, Henderson is substantially limited in the activities of: "work tasks, daily light tasks, concentration and prolonged interaction with large groups of people." Pl. Mtn. p. 8. "Daily light tasks, concentration and prolonged interaction with large groups of people" are not included under the regulations. *See* 29 C.F.R. § 1630.2(i). Henderson has cited to the Court no case law recognizing these activities as "major life activities" under the ADA.

Regarding Henderson's alleged substantial limitation regarding "work tasks," there is no evidence before the Court establishing that she has, in fact, been limited in her ability to work. She has provided evidence only of the existence of an underlying impairment. Moreover, Henderson has not shown that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities" See 29 C.F .R. § 1630.2(j)(3)(i). As has been already stated, "the inability to perform a single, particular job does not constitute a substantial limitation in the·major life activity of working." *Id.; Ellison*, 85 F.3d at 190.

One whose impairment merely **affects** one or more major life activities is not disabled. *Barfield*, 886 F.Supp. at 1324 (emphasis added). Rather, an individual is disabled for purposes of the ADA only if her impairment "substantially limits" a major life activity, in that it either makes the individual unable to perform a major life activity, or severely restricts her ability to perform a major life activity as compared to the general population. *Id.*

The Court in *Ellison* found against the plaintiff after considering the following evidence:

> "[Ellison's physician] stated that cancer can cause death if not treated and causes emotional distress from the fear that it will return. [Ellison] submitted also the deposition of her former supervisor ... [who] stated that Ellison was not as effective at work, and that the quality of her work suffered while she was receiving radiation treatment. And, in her affidavit, Ellison detailed the nausea, fatigue, swelling, inflammation, and pain she experienced as a result of the treatment and the medication she was given for her allergic reaction to the radiation, but stated that, although she constantly felt sick and fatigued, she 'could perform [her] essential job responsibilities .... so long as [SSI] allowed [her] the accommodation of a modified work schedule so that [she] could attend appointments with [her] doctors and receive [her] treatments.... " [T]he summary judgment evidence, viewed in the light most favorable to Ellison, does not create a material fact issue on whether her cancer and treatment 'substantially limited' her major life activity of working. Obviously, her ability to

work was affected; but, as reflected in the ... statute and regulations, far more is required to trigger coverage under [the ADA]."

*Ellison,* 85 F.3d at 191.

Henderson has provided no evidence that she has been substantially limited in her ability to work. Indeed, she has testified that she is able to perform her job notwithstanding her CVIDD. Henderson Depo. pp. 119–120. She provides no evidence of the number of times she has been absent as a result of getting ill due to having CVIDD, nor how long it took for her to recuperate each time.[14] *See e.g., Schluter v. Industrial Coils, Inc.,* 928 F.Supp. 1437, 1446 (W.D.Wis. 1996) (Plaintiff must show her diabetes substantially limits her in a major life activity by showing that it affects her in fact, rather than how it would affect her hypothetically if she were unable to obtain insulin..... Plaintiff's evidence of insulin reactions is too vague to be significantly probative. She does not say how often she experiences nausea, weakness, dizziness and sleeplessness or how those conditions are any worse for her than for other people); *Barfield,* 886 F.Supp. at 1324–25 (Where plaintiff failed to establish the frequency and duration of her intense headaches and alleged "sporadic and unpredictable" absences from work, plaintiff failed to establish she was disabled under ADA). At best, viewing the evidence before the court in the light most favorable to Henderson, she has indicated that, while her CVIDD doesn't keep her from working, she can't work as productively as she'd like. Lumry Depo. pp. 141–142. This, alone, is insufficient to establish a substantial limitation. *Ellison,* 85 F.3d at 191; *Barfield,* 886 F.Supp. at 1324. Her physician has not re-

quired her to "live in a bubble."[15] Instead, he has directed Henderson only to avoid sick people, wash her hands regularly, avoid exposure to irritants, fumes, vapors, or odors, and to avoid exposure to things to which she knows she is allergic, e.g., molds, spores and house dust. Lumry Depo. p. 140.

Moreover, Henderson's concerns about and allegedly requested accommodations regarding her work environment indicate not that Henderson is substantially impaired in her ability to work, but that she feels she cannot work in her current work environment. If this is Henderson's contention, she cannot recover under the ADA.[16] The cases which address impairments occurring only in the plaintiff's work environment, and which either are alleviated or nonexistent outside that environment, find that the plaintiffs have not shown that they are disabled, because they've shown only that they cannot perform a specific job. *See, e.g., Heilweil,* 32 F.3d at 723; *Mobley,* 924 F.Supp. at 1187; *Patrick,* 910 F.Supp. at 570; *Sharp v. Abate,* 887 F.Supp. 695, 699–700 (S.D.N.Y.1995).

Based on the foregoing, the Court finds that Henderson has failed to establish that she is substantially limited in a major life activity as required under the ADA.

### C. "Reasonable Accommodation"

When the issue of reasonable accommodation is raised, the burden of persuasion in proving inability to accommodate always remains on the employer; however, once the employer presents credible evidence that reasonable accommodation is not possible or practicable, the plaintiff must bear the burden of coming forward with evidence that suggests that accommodation may in fact be reasonably made. *Prewitt v. United States*

---

**14.** Henderson's Complaint alleges only that she misses approximately one full work-day per month to receive her IV immunoglobulin replacement therapy. Pl.Compl. Para. 14. There is no evidence from which to conclude that these absences substantially limit Henderson's ability to work.

**15.** Lumry testified that Henderson is not prohibited from going to the movies, going to the store, eating in a restaurant, attending church—except perhaps on Christmas. Lumry Depo. pp. 46, 140–41. This evidence is corroborated by that

provided by Defendant's medical expert. See Abramson Affid. Paras. 5–6.

**16.** Henderson's complaints and requested accommodations regarding the air vents fall into this category. At the same time, Henderson has testified that her CVIDD concerns are not problematic because of anything unique to NYL generally or the particular floor she's on. Henderson Depo. p. 119. She alleges she would have the same problem if she worked in any work environment where she would be around people who breathe, sneeze and cough. *Id.*

*Postal Service,* 662 F.2d 292, 310 (5th Cir. 1981). When the employer has moved for summary judgment, unrebutted evidence of inability to accommodate is grounds for summary judgment. *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir.1995), *Morton,* 922 F.Supp. at 1178.

For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability. *Taylor,* 93 F.3d at 164. This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities. *Id.* The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. *Id.*

In general, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed. *Id.* at 165. Once such a request has been made, the appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability. *Id.* In other words, once an accommodation is properly requested, the responsibility for fashioning a reasonable accommodation is shared between the employee and employer. *Id.* Thus, it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one. *Id.* If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one. *Id., Sharp,* 887 F.Supp. at 699–700.[17]

The ADA does not require an accommodation that would result in other employees having to work harder or longer hours. *Turco,* 101 F.3d at 1094, *Munoz v. H & M Wholesale, Inc.,* 926 F.Supp. 596, 607–08 (S.D.Tex.1996). Additionally, the ADA does not require an employer to promote a disabled employee, nor must an employer reassign the employee, to an occupied position, or to create a new position to accommodate the disabled worker. *Id.* NYL is not required to "bump" other employees to create a vacancy so as to reassign Henderson. *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 526 (7th Cir.1996).

### 1. Accommodation Regarding Air Vents

Henderson admits that when she filed her first EEOC Charge, she had not actually requested such an accommodation, Henderson Depo. pp. 205, 208. Moreover, she admits that, once Bycott received her request, it was accommodated. Id. at pp. 94–95. In short, any claims Henderson has regarding NYL's alleged failure to accommodate in this regard are not actionable.

### 2. Accommodation Regarding Working At Home/Modified Schedule

The evidence shows that at no time prior to filing her first EEOC Charge did Henderson ask Bycott to let her work at home. Bycott Depo. pp. 93, 152. Nor did she ask Theda Doles, her immediate supervisor. Doles Depo. p. 110. Moreover, the Charge and accompanying affidavit are silent regarding this accommodation. Def.Opp. to Pl.Mtn., Ex. 7; Henderson Depo.Ex. 23. Instead, the evidence shows that before the lawsuit was filed, Henderson never requested this accommodation.[18] Henderson Depo. p.

**17.** In light of the foregoing, it is debatable whether Henderson could be considered to have requested an accommodation when she mailed her completed Invitation to Self–Identify, yet neglected to inform Bycott or Doles regarding its contents.

**18.** While Bycott's September 26 memo refers to a letter from Lumry dated August 26, 1996, which outlines an alleged request from Henderson to work at home, none of the parties have included this letter in their summary judgment evidence. The memo seems to indicate that Lumry "wanted to limit [Henderson's] exposure to her current office building for a period of one month." If the Court takes as true that Henderson's impairment requires her to be away from sick people, an accommodation which removes Henderson from contact with people who might be sick for a period of one month only does not appear to be a plausible accommodation for an impairment which, one would assume, would exist when Henderson returned after a month.

88–89, 91–92, 94, 194; Bycott Depo. pp. 147, 152; Doles Depo. p. 80. Moreover, the only evidence before the Court regarding this accommodation, is that it would impose an undue hardship on NYL and would adversely impact other employees in contravention of *Munoz.* Bycott Depo. pp. 113–18; Doles Depo. pp. 86–90. Moreover, if Henderson worked at home, Doles would be unable to supervise Henderson's claims processing, which, as of the time depositions were taken, was not meeting company goals, and it would impair Henderson's ability to perform the essential functions of her job. Bycott Depo. pp. 113, 117; Doles Depo. pp. 18, 38, 107–08, 116–18; 140–41.

### 3. Accommodation Regarding Enclosed Office

█ The evidence indicates that Henderson never requested such an accommodation of Bycott or Doles. Henderson Depo. p. 92; Bycott Depo. pp. 93, 152, 154, Doles Depo. p. 110. Moreover, the evidence indicates that NYL did not have any enclosed offices that were vacant, and that the offices which NYL had either were occupied by management or were shared by at least two life insurance claims examiners each whose unique claims processing duties required them to be in that location together, Bycott Depo. pp. 90, 95–96, 111; Doles Depo. pp. 83–84, 89–90, 112–114. Notwithstanding the foregoing, Henderson's contention that placing her in one of these offices with another employee would reasonably accommodate her limitations, and would be better than her current work site, is not plausible. Inasmuch as her concern is exposure to bacteria and viruses, it appears obvious that being in an enclosed office with another employee would put Henderson in concentrated contact with that employee's germs. In contrast, the evidence indicates that in her current cubicle work space, the employee nearest Henderson cannot cough, sneeze or breathe directly onto Henderson. Henderson Depo. pp. 26–30; Bycott Depo. pp. 112, 154, 156, Doles Depo. pp. 111–12; Abramson Affid. Para. 6. The evidence indicates also, that the air quality in the open area is not different from that in the enclosed office. Vining Affid. p. 2.

Finally, there is no evidence that accommodating Henderson in this regard would be effective. All of Henderson's evidence, including that of her physician, is speculative. Dr. Lumry uses the words "may," "might," "hopefully," and "well worth trying" when he describes the hypothetical effect of the suggested accommodations. *See* Pl.Compl.Ex. E; Lumry Depo. pp. 36, 48, 141–42. The only unequivocal evidence before the Court is provided by Dr. Abramson, who states: "There is no reasonable medical probability that Ms. Henderson's medical condition would significantly improve if she worked in a completely enclosed office or at her home. Isolating Ms. Henderson in a completely enclosed office or at home is not medically necessary, indicated, or appropriate." Abramson Affid. Para. 7.

The bottom line, as it appears to the Court after reviewing the record, is that Henderson doesn't merely want NYL to accommodate her; she wants NYL to make her well.[19] This it clearly is not required, or able, to do. Moreover, all accommodations which

---

Bycott Depo.Ex. 9.

19. See Henderson Depo. pp. 120, 199–200, in which Henderson states the following:
Q: [A]t some point, you had some concern that there might be something particular about this building or its air-conditioning system that was causing you a problem; correct?
A: At that—at that time, I didn't know.
Q: But that was a concern of yours; right?
A: It was a concern, yes.
Q: Am I hearing you right that now, although you had that concern in the past, now your concern is really not about the building or the heating and cooling system, per se, it's the fact that you're exposed to other human beings?
A: That I remain ill.
And . . .
Q: And so since those are the only two communications that ever came from your doctor and you have now told us that nothing in either of them was ignored, on Henderson—on your invitation to self-identify where you write no accommodation is being made, all requests by my doctors have been ignored, that's not accurate either, is it?
A: It's not accurate in the sense that from what you are saying he had done that.
Q: Okay.
A: But I was still sick.

Henderson requested of NYL were made. Henderson Depo pp. 94–95, 198–99.

In conclusion, based on the foregoing law and the evidence before the Court, the Court finds that Henderson has failed to establish that she is a qualified individual with a disability under the ADA. Accordingly, she is not entitled to summary judgment.

## V. FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

An employee must comply with the ADA's administrative prerequisites prior to commencing an action in federal court against her employer for violation of the ADA—i.e., she must file a timely charge with the EEOC. *Dao v. Auchan Hypermarket,* 96 F.3d 787, 789 (5th Cir.1996). The filing of an administrative complaint is ordinarily a jurisdictional prerequisite to a Title VII action. *Ray v. Freeman,* 626 F.2d 439, 442 (5th Cir.1980), *cert. denied,* 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 198 (1981). The scope of a plaintiff's claims is limited by the allegations raised in the Charge of Discrimination. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir.1970). *Morton,* 922 F.Supp. at 1177. A Title VII cause of action may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination. *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995); *Fine v. GAF Chemical Corp.,* 995 F.2d 576, 578 (5th Cir.1993).

NYL argues that Henderson's first EEOC Charge was filed too late as to conduct allegedly occurring in 1992–1994. NYL points out to the Court that the applicable statute of limitations bars any claims based on facts allegedly occurring more than 300 days before the charge is filed. *See* 42 U.S.C. § 2000e–5(e)(1). In addition, any alleged actions occurring prior to July 26, 1992, the ADA's effective date, are not covered under the Act. *O'Bryant v. City of Midland,* 9 F.3d 421, 422 (5th Cir.1993).

The evidence indicates that Henderson made false representations in her first EEOC Charge. Henderson Depo. pp. 88, 91–92, 195, 199–200, 208–09. Moreover, the only accommodation requested, once it was made, was provided. Henderson Depo. pp. 198–200, 209. The court must determine whether the claims in Henderson's Complaint that go beyond the "air vent accommodation" involve "discrimination like or related to the charge's allegations" or which "could reasonably be expected to grow out of the initial charges of discrimination," *Dollis,* 77 F.3d at 781; *Fine,* 995 F.2d at 578.

While the affidavit which Henderson filed in connection with her first charge does alert the agency to Henderson's CVIDD, Henderson cannot overcome her failure to state or request any accommodations other than that involving the air vents. See Henderson Depo.Ex. 23; Def.Opp. to Pl. Mtn., Ex. 7.

As to Henderson's second EEOC Charge, the Court finds that it was filed subsequent to the filing of this lawsuit and, therefore, cannot be considered as a basis for evaluating whether the claims in Henderson's complaint have met jurisdictional prerequisites. *Dao,* 96 F.3d at 789; *Ray,* 626 F.2d at 442. Based on the foregoing, the Court finds that Henderson has failed to exhaust her administrative remedies regarding any claims that involve accommodations other than those pertaining to the air vent problems. As a result, Henderson cannot recover on those claims.

## VI. STATE LAW CLAIMS

Henderson's state law claims are for negligent training, negligent supervision, negligent retention and intentional infliction of emotional distress. Pl.Compl. Paras. 38–51. As already noted, her intentional infliction of emotional distress claim, insofar as it is based on allegedly being forced to wear masks to work, must fail. Henderson has admitted no one directed her to wear the masks. Henderson Depo. p. 237. Moreover, inasmuch as her emotional distress and negligence claims are based upon Henderson's alleged disability and NYL's alleged discrimination, they must fail because the Court finds

that Henderson has failed to establish that she is a qualified individual with a disability who has been discriminated against under the ADA.

### CONCLUSION

In summary, the Court finds that Henderson has not established one or more of the elements required under the ADA, that she has failed to exhaust her administrative remedies; and that her state law claims, inasmuch as they depend upon Henderson being disabled, fall with Henderson's failure to establish her disability under the ADA.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Plaintiff's Motion for Summary Judgment is **DENIED;** Defendant's Motion to Strike is **DENIED;** and Defendant's Motion for Summary Judgment is **GRANTED;** that Plaintiff take nothing in her action against Defendant; that Defendant be awarded its costs pursuant to Fed.R.Civ.P. 54(d), and that Cause No. 3:96–CV–1046–P is hereby **CLOSED.**