Albert TALAMANTEZ, Plaintiff,

v.

**CORRECTIONS CORP OF AMERICA (EDEN DETENTION CENTER),** Defendant.

No. CIV.A.6:01–CV–020–C.

United States District Court,
N.D. Texas,
San Angelo Division.

March 29, 2002.

Chad A Cox, Cox & Hatcher, San Angelo, TX, for Albert Talamantez, plaintiff.

Stuart G Smith, Naman Howell Smith & Lee, Waco, TX, for Corrections Corp of America (Eden Detention Center), defendant.

## ORDER

CUMMINGS, District Judge.

On this date the Court considered Defendant's Motion for Summary Judgment filed on January 15, 2002, by Corrections Corp. of America ("Defendant"). Albert Talamantez ("Plaintiff") untimely filed Plaintiff's Response to Defendant's Motion for Summary Judgment on February 5, 2002. This Court need not consider materials submitted after a reasonable filing deadline. Nevertheless, for the sake of thoroughness and clarity, this Court also considered the pertinent arguments raised by Plaintiff's untimely filed Response. Defendant's Reply Brief to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment was filed on February 19, 2002. After considering all the relevant arguments and evidence, the Court

GRANTS Defendant's Motion for Summary Judgment.

## I.

### FACTUAL BACKGROUND

Plaintiff is an Hispanic male, over forty years of age, with date of birth March 25, 1955. Defendant employed Plaintiff as a corrections officer beginning November 13, 1995. On or about August 21, 1996, while employed by Defendant at the Eden Detention Center, Plaintiff suffered serious injuries when he was struck on the head with a pipe during an inmate riot. Plaintiff was allowed to return to work on August 28, 1996, with no restrictions. Following his return to work, Plaintiff applied for and received a promotion to the position of Assistant Shift Supervisor.

On January 22, 1998, Plaintiff passed out while on duty. On January 29, 1998, Plaintiff's physician released Plaintiff back to work without restrictions, but on or about February 11, 1998, Plaintiff's doctor advised that "it would be extremely beneficial for [Plaintiff] to work the night shift, instead of his current daytime position." Defendant placed Plaintiff on the night shift.

On May 7, 1998, Plaintiff's physician reported that Plaintiff had reached maximum medical improvement and had been assessed a thirteen percent impairment rating. As a result of Plaintiff's condition, Plaintiff's doctor recommended that Plaintiff "have a structured position, to avoid stressful situations, preferably clerical-type duties, to have simple tasks and avoid multitask situations." Based on Plaintiff's physician's recommendations, Defendant transferred Plaintiff to yard duty. Defendant contends that yard duty is less stressful because the duties focus on cleaning the grounds and supervising out-custody

prisoners who have been cleared for outside duty.[1] Defendant argues that the prisoners cleared for outside duty require less supervision because they are considered neither violent nor escape risks. Although yard duty corrections officers are normally paid less than Assistant Shift Supervisors, Defendant continued to pay Plaintiff at the Assistant Shift Supervisor rate.

On March 13, 2000, Plaintiff suffered dizziness and had a "fainting episode" while performing his duties as outside groundskeeper. An out-custody inmate reported to Defendant's maintenance supervisor that Plaintiff had fallen to the ground and was not moving. The maintenance supervisor arrived at the scene just in time to see Plaintiff "dusting himself off." Plaintiff declined Defendant's offer of medical assistance and was taken home.

Plaintiff reported back to work on March 15, 2000, and met with Assistant Warden William Magee. Assistant Warden Magee advised Plaintiff that he would not be allowed to supervise inmates until Plaintiff saw his doctor, corrected the dizziness/fainting problem, and got a medical release. Plaintiff agreed that it would be dangerous for him to pass out while supervising out-custody inmates.

May 23, 2000, was the first available appointment Plaintiff could schedule with his primary physician, Dr. Buechel, so Plaintiff saw a different physician, Dr. Hooman Sedighi, in April 2000. Plaintiff testified that Defendant was helpful with regard to Plaintiff's rescheduling of doctors and that Defendant had agreed to verify that Plaintiff was covered by health insurance. Nevertheless, on or about April 20, 2000, because Plaintiff's workers' compensation benefits had been exhausted,

---

1. "Out-custody" inmates are those inmates cleared for working outside the perimeter of the facility and outside any fencing and/or barricades.

Plaintiff was put on unpaid medical leave under the Family and Medical Leave Act ("FMLA"). At that time, Plaintiff told Defendant's Personnel Coordinator, Anita Osburn, that "I wish [Defendant] would just fire me so I could collect unemployment." During Plaintiff's medical leave, Defendant temporarily assigned a younger, Caucasian, non-disabled male to fill in for Plaintiff.

Over the next several weeks, Ms. Osburn attempted to contact Plaintiff but was unsuccessful. Finally, on April 21, 2000, Ms. Osburn spoke with Plaintiff's wife at Plaintiff's home. Ms. Osburn testified that she gave to Plaintiff's wife a number of health care and insurance forms for Plaintiff's use to try to obtain short-term benefits.

Plaintiff testified that Defendant (1) had not given Plaintiff a letter of termination, (2) had not asked Plaintiff to turn in his identification badge, and (3) had not asked Plaintiff to return Defendant's uniforms. Although Plaintiff complains that he was constructively discharged by being put on FMLA leave, Plaintiff acknowledged that no one had ever told him he was terminated and that, after his "fainting episode" on March 13, 2000, he had made no effort to return to work for Defendant.

Plaintiff also testified that he had never heard any racially derogatory remarks or racially inappropriate jokes while employed by Defendant. Plaintiff confirmed that no derogatory comments had ever been made about his age. Plaintiff testified that he had never been disciplined for any problems at work and did not think that the warden or assistant warden disliked him or had any ill will towards him. Plaintiff also disavowed any counseling or psychiatric care for emotional or mental health problems subsequent to leaving Defendant's employ.

Plaintiff testified that he had successfully worked as a self-employed, part-time auto mechanic before, during, and after working for Defendant. Plaintiff also testified that, after he left Defendant's employ, he successfully worked full-time on various drilling rigs and planned to return to full-time work on a rig in early 2002. Plaintiff testified that his income from the drilling rigs was the highest income he had ever earned. In addition, Plaintiff testified that he is raising his twelve-year-old daughter without assistance and, except for headaches, that he has been feeling fine, has no problems with his vision, and is able to watch television, although Plaintiff did complain that he has some difficulty with reading comprehension.

In the instant case, Plaintiff claims national origin, age, and disability discrimination, hostile work environment, disparate treatment, retaliation, and intentional infliction of emotional distress. Plaintiff prays for declaratory judgment, a permanent injunction, lost income and fringe benefits, punitive damages, costs and expenses, and attorneys' fees.

## II.

### PROCEDURAL BACKGROUND

Plaintiff's Complaint and Jury Demand was filed on March 20, 2001, and Defendant's Original Answer was filed on May 23, 2001. On January 15, 2002, Defendant's Motion for Summary Judgment was filed. Plaintiff's Response to Defendant's Motion for Summary Judgment was untimely filed on February 5, 2002, and Defendant's Reply Brief to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment was filed on February 19, 2002.

## III.

### STANDARD

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when

viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. 2505. In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505. Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir.1996) (en banc); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1993). To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson,* 477 U.S. at 251, 106 S.Ct. 2505. Rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.*

## IV.

### DISCUSSION

Plaintiff claims national origin, age, and disability discrimination, hostile work environment, disparate treatment, retaliation, and intentional infliction of emotional distress. Plaintiff bases these claims on Defendant's alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); violations of Plaintiff's civil rights as protected by 42 U.S.C. § 1981 (" § 1981"); violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"); violations of state law prohibitions of discrimination and/or retaliation pursuant to Texas Labor Code § 451.001, *et seq.* (" § 451.001"); and the intentional infliction of emotional distress.

Defendant argues that Plaintiff cannot establish a *prima facie* case for any of his causes of action, and because no genuine issues of material fact exist, summary judgment is appropriate.

### Title VII, ADEA, § 1981

■ Claims of national origin discrimination under Title VII, claims of age discrimination under the ADEA, and claims of civil rights violations under § 1981 are all evaluated within the same analytical framework. *See Evans v. City of Houston,* 246 F.3d 344, 349 (5th Cir.2001) and *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 422 n. 1 (5th Cir.2000). The United States Supreme Court has developed a scheme to deal with cases in which discrimination can be proved only by circumstantial evidence, as in this case. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In such cases, a plaintiff must first prove a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

If a plaintiff is successful in establishing a *prima facie* case of discrimination, the

burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions. *Id.* at 142. If the defendant articulates a reason that would support a finding that the action was non-discriminatory, "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out of the picture." *Evans,* 246 F.3d at 349 (internal quotations and citations omitted). Finally, the burden then shifts back to the plaintiff to show that the defendant's nondiscriminatory explanation is pretextual. *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097. "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the defendant unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097.

### *Plaintiff's Prima Facie Case*

To establish a *prima facie* case of national origin discrimination, Plaintiff must show (1) that he was a member of a protected class; (2) that he was qualified for the position held; (3) that he suffered an adverse employment action; and (4) that he was replaced by someone outside his protected class. *Rios v. Rossotti,* 252 F.3d 375, 378 (5th Cir.2001).

For a *prima facie* case of age discrimination, the factors remain essentially the same, but Plaintiff must show that he was over the age of forty when the discrimination occurred and that he was replaced by someone younger or was otherwise discharged because of his age. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 223–24 (5th Cir.2000).

■ To establish a claim under § 1981, Plaintiff must prove a *prima facie* case of discrimination. *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995) The elements of claims alleging violations of Title VII and § 1981 are identical. *Flanagan v. Aaron E. Henry Cmty.*

*Health Servs. Ctr.,* 876 F.2d 1231, 1233 (5th Cir.1989).

This Court agrees that Plaintiff has established that he is a member of a protected class under Title VII and the ADEA, *i.e.,* Hispanic and over forty years of age in March 2000, and that Plaintiff is entitled to the protections afforded under § 1981. This Court is also persuaded that Plaintiff was qualified for the position of groundskeeper and that the person assigned in March 2000 to fill the groundskeeper position, albeit temporarily, was Caucasian, younger than Plaintiff, and non-disabled.

■ However, this Court is not persuaded that Plaintiff suffered an adverse employment action as required by the *prima facie* elements of discrimination. "Adverse employment actions" include only "ultimate employment decisions ... such as hiring, granting leave, discharging, promoting, and compensating." *Mota v. Univ. of Tex. Houston Health Science Ctr.,* 261 F.3d 512, 519 (5th Cir.2001). Plaintiff complains that he suffered actual or constructive discharge at the time he was placed on FMLA medical leave. This Court finds, however, that Plaintiff has offered no competent summary judgment evidence to support his claims of actual or constructive discharge.

To the contrary, Plaintiff testified that he had never been told he was terminated, that he had never received a letter of termination, that he had never been asked to return Defendant's identification badge, and that he had never been asked to return Defendant's uniforms. In addition, Plaintiff testified that he "wished [Defendant] would just fire" him. Obviously, even Plaintiff himself did not consider that he had actually been terminated by Defendant.

■ To prove constructive discharge, Plaintiff must establish that "working con-

ditions were so intolerable that a reasonable employee would feel compelled to resign." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.2001). "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Id.* "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." *Id.*

Plaintiff has offered no evidence of intolerable working conditions or *any* degree of harassment sufficient to support his claim of constructive discharge. Indeed, Plaintiff testified that he had never heard any racially derogatory remarks or racially inappropriate jokes while employed by Defendant. Plaintiff confirmed that no disparaging comments had ever been made about his age. Plaintiff testified that he had never been disciplined for any problems at work and did not think that the warden or assistant warden disliked him or had any ill will towards him. Finally, Plaintiff testified that after his "fainting episode" in March 2000, Plaintiff had made no effort whatsoever to return to work for Defendant, not that Plaintiff had found conditions so intolerable that Plaintiff felt compelled to resign.

Consequently, this Court finds that Plaintiff has failed to establish an adverse employment action, through either actual or constructive discharge, as required under the *prima facie* elements of discrimination under both Title VII or the ADEA. Therefore, this Court finds that Plaintiff's claims for discrimination under Title VII and the ADEA must fail.

### ADA

#### Plaintiff's Prima Facie Case

■ Discrimination under the ADA occurs when a plaintiff proves that (1) he has a "disability"; (2) he is a "qualified individual" for the job in question; (3) an adverse employment decision was made because of his disability; and (4) he was replaced by

or treated less favorably than non-disabled employees. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279–80 (5th Cir.2000). *See also Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 294 (5th Cir.1998). If a plaintiff establishes his *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McInnis*, 207 F.3d at 280. Once the employer articulates such a reason, the burden then shifts back to the plaintiff to establish that the employer's reason was merely a pretext for unlawful discrimination under the ADA. *Id.*

■ The threshold question under the ADA is whether the plaintiff is disabled, or is regarded as being disabled. 42 U.S.C. § 12101(b). Failure to establish an actual or perceived disability is fatal to a plaintiff's case. *McInnis*, 207 F.3d at 280. A plaintiff must meet this burden in order to survive a summary judgment motion. *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1121 (5th Cir.1998).

"Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Physical impairment" is defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary; hemic and lymphatic; skin; and endocrine." 29 C.F.R. § 1630.2(h)(2) (2002).

■ In the instant case, the parties agree that Plaintiff had reached maximum medical improvement and had been assigned a thirteen percent impairment rat-

ing. However, merely having an impairment does not make a plaintiff "disabled" for purposes of the ADA. Plaintiff must also demonstrate that the impairment limits his "major life activities." 42 U.S.C. § 12102(2)(A). Examples of "major life activities" include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(2)(i).

An impairment substantially limits a major life activity if the individual

(i) is unable to perform a major life activity that the average person in the general population can perform; or

(ii) is significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

With respect to the major life activity of working, the term "substantially limits" means

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

■ The analysis of whether a plaintiff's impairment interferes with or substantially limits a major life activity in such a way as to constitute a disability requires an individualized inquiry. *McInnis*, 207 F.3d at 281. "The determination of whether an individual has a disability is not necessarily based on the ... impairment the person has, but rather on the effect of that impairment on the life of the

individual." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

■ Plaintiff testified that both prior to and subsequent to the injuries sustained during the inmate riot and Plaintiff's "fainting episode" in March 2000, Plaintiff had successfully worked as a part-time auto mechanic. Plaintiff testified that subsequent to receiving his initial injuries and the March 2000 incident, Plaintiff had successfully worked full-time on different drilling rigs and that Plaintiff fully expected to return to full-time employment on a rig in early 2002. Plaintiff also testified that he is raising his daughter without assistance and is able to safely drive automobiles. Finally, although Plaintiff currently holds a valid certificate to work as a jailer, Plaintiff acknowledged that it would be dangerous for him to pass out while supervising inmates.

■ This Court finds that Plaintiff's inability to perform the single, particular job of supervising inmates does not constitute a substantial limitation in Plaintiff's major life activity of working. In addition, because Plaintiff admits, *inter alia*, that he continues to successfully work as an auto mechanic, that he has successfully worked on and anticipates continuing to work on rigs, that he is raising his daughter without assistance, and that he continues to safely drive automobiles, this Court finds that Plaintiff's thirteen percent impairment does not significantly restrict Plaintiff in his ability to perform a broad range of jobs or otherwise significantly interfere or substantially limit Plaintiff's major life activities. Thus, this Court finds that Plaintiff has failed to establish the threshold element of his *prima facie* case of discrimination under the ADA, *i.e.*, that Plaintiff is disabled. In addition, as discussed above, this Court is also of the opinion that Plaintiff has been unable to

show that an adverse employment action was taken by Defendant. Consequently, because Plaintiff has failed to produce evidence sufficient to establish a *prima facie* case for discrimination under the ADA, and because Plaintiff has been unable to establish that Defendant engaged in any activity prohibited by the ADA, this Court finds that Plaintiff's claims for discrimination under the ADA must fail.

### Retaliation—Title VII, § 451.001

#### Plaintiff's Prima Facie Case

 To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate "(1) that [he] is engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Fierros v. Tex. Dep't of Health,* 274 F.3d 187, 191 (5th Cir.2001).

 To recover under § 451.001, Plaintiff must show that his discharge would not have occurred when it did but for Plaintiff's assertion of a workers' compensation claim against the Defendant. *Burch v. City of Nacogdoches,* 174 F.3d 615, 623 (5th Cir.1999). Plaintiff has the burden of establishing a causal nexus between Plaintiff's filing of a workers' compensation claim and his discharge. *Munoz v. H. & M Wholesale, Inc.,* 926 F.Supp. 596, 609 (S.D.Tex.1996). Plaintiff need not prove that his assertion of a workers' compensation claim was the sole reason for his discharge, but he must establish that it was a determining factor. *Id.*

Section 451.001 specifically states as follows:

A person may not discharge or in any other manner discriminate against an employee because the employee has:

(1) filed a workers' compensation claim in good faith;

(2) hired a lawyer to represent the employee in a claim;

(3) instituted or caused to be instituted in good faith a proceeding under [§ 401.001, *et seq.*]; or

(4) testified or is about to testify in a proceeding under [§ 401.001, *et seq.*].
§ 451.001.

First, as discussed *supra,* Plaintiff has failed to establish that he suffered either actual or constructive discharge. Second, Ms. Osburn testified that she, not Plaintiff, filed the workers' compensation supplemental claim on Plaintiff's behalf. Third, Plaintiff testified that he had neither filed a notice of injury nor had any injuries in connection with work in the year 2000. Fourth, "[i]t would seem highly irregular, to say the least, if the [Defendant] ... determined to terminate [Plaintiff] for filing a claim when the [Defendant] itself had filed it." *Burch,* 174 F.3d at 623.

In the absence of competent evidence of retaliation, this Court finds that Plaintiff cannot satisfy his *prima facie* burdens under either Title VII or § 451.001. Therefore, because Plaintiff cannot support claims that Defendant retaliated against him for engaging in protected activity, this Court finds that Plaintiff's claims of retaliation are without merit and must fail.

### Intentional Infliction of Emotional Distress

#### Plaintiff's Prima Facie Case

 Intentional infliction of emotional distress requires Plaintiff to prove the following elements: (1) that Defendant acted intentionally or recklessly; (2) that Defendant's conduct was extreme and outrageous; (3) that Defendant's actions caused Plaintiff emotional distress; and (4) that Plaintiff's resulting emotional distress was severe. *Standard Fruit & Vegetable Co., Inc. v. Johnson,* 985 S.W.2d 62, 65 (Tex.1998). A claim for intentional infliction of emotional distress is available only in those instances in which severe emotion-

al distress is the intended or primary consequence of Defendant's conduct. *Id.* at 67.

For Defendant's conduct to be sufficiently extreme and outrageous, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993)). Insensitive or even rude behavior does not constitute extreme and outrageous conduct. *Id.* at 699. "Similarly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not rise to the level of extreme and outrageous conduct." *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex.1999).

Plaintiff has offered no evidence that Defendant acted intentionally or recklessly with the intended primary consequence being Plaintiff's emotional distress. Nor has Plaintiff shown that any of Defendant's conduct was outrageous in character, extreme in degree, or in any other manner atrocious or utterly intolerable. Further, Plaintiff has offered nothing to substantiate that emotional distress was actually suffered by Plaintiff or that such distress was severe.

Therefore, this Court finds that Plaintiff's arguments do not support a claim of intentional infliction of emotional distress and that summary judgment as to this claim is also appropriate.

### CONCLUSION

After considering all the arguments and evidence, this Court **GRANTS** Defendant's Motion for Summary Judgment.